# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

========================

## ON MOTION FOR REHEARING

========================

### NO. 03-04-00389-CV

**Ken Patton, Appellant**

**v.**

**Bobbie Kaye Jones, Individually; Barbara Ruth, Individually; John Wright, Individually; St. John's United Methodist Church; Oak Hill United Methodist Church; The Austin District of the United Methodist Church; and Southwest Texas Conference of the United Methodist Church, Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT
NO. GN304244, HONORABLE C. W. DUNCAN, JR., JUDGE PRESIDING**

## O P I N I O N

We grant appellees' motion for rehearing, withdraw our opinion and judgment issued May 11, 2006, and substitute the following in its place.

Appellant Ken Patton urges that the trial court erred in dismissing his case for a lack of subject matter jurisdiction because the First Amendment's ecclesiastical abstention doctrine, which encompasses a ministerial exception, does not bar judicial review of his claims for defamation and tortious interference with an employment contract. Appellees, Pastor Bobbie Kaye Jones, Pastor

Barbara Ruth, Pastor John Wright, St. John's United Methodist Church, Oak Hill United Methodist Church, The Austin District of the United Methodist Church, and the Southwest Texas Conference of the United Methodist Church (collectively, "The Church") respond that because Patton, as the Director of Youth Ministries for the Oak Hill United Methodist Church, was employed in a ministerial role, the First Amendment prohibits judicial review of the Church's actions and communications surrounding Patton's termination. We will affirm the dismissal.

## STANDARD OF REVIEW

A motion to dismiss based on a lack of subject matter jurisdiction is functionally equivalent to a plea to the jurisdiction challenging the trial court's authority to determine the subject matter of a cause of action. *Lacy v. Bassett*, 132 S.W.3d 119, 122 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (discussing dismissal based on ecclesiastical doctrine) (citing *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000)). We review the record *de novo* to determine whether the trial court had subject matter jurisdiction. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998). We consider only the evidence pertinent to the jurisdictional inquiry and do not weigh the merits. *County of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002). Also, we construe the pleadings in favor of the plaintiff, accepting all his allegations as true. *Bland Indep. Sch. Dist.*, 34 S.W.3d at 555. To prevail, the defense must show that, even accepting all of the plaintiff's allegations as true, an incurable jurisdictional defect remains on the face of the pleadings that deprives the trial court of subject matter jurisdiction. *Brenham Hous. Auth. v. Davies*, 158 S.W.3d 53, 56 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

2

Construing the allegations in Patton's pleadings as true, and considering the uncontested evidence, we find the following undisputed facts in the record.[1]

**BACKGROUND**

Patton was employed by Oak Hill United Methodist Church as the Director of Youth Ministries from April 2002 until October 31, 2002.[2] In that position, Patton was responsible for "the administration and organizing of recreational events for the youth, such as camping outings and other social gatherings. . . . [Patton] coordinated the transportation, . . . oversaw the logistics, . . . [and] served as a chaperone." He also "managed the budget for the youth program, recruited [adult and youth] participants, registered the attendees at events, [] collected participation fees from attendees, [and] performed fundraising duties."

On October 24, 2002, appellee Jones (a Pastor at St. John's) discussed with appellee Wright (an Associate Pastor at Oak Hill) whether Patton should be terminated from Oak Hill. According to handwritten notes taken by Pastor Wright, Pastor Jones told him about allegations that Patton had upset congregation members by dating certain women and by putting his arm around girls at church. Pastor Jones also described a rumor that Patton had used internet pornography as being "unsolicited, anecdotal, [and] unsubstantiated." Patton contends that each of the rumors are false.

---

[1] The only evidence in the record was offered by Patton, consisting of his affidavit, a copy of handwritten notes used in the Church's meeting about Patton's employment, and a letter from the chairwoman of the parish committee that decided to terminate Patton. At the hearing on the motion to dismiss, no testimony was offered; only argument by counsel was presented.

[2] Patton had previously served as the Interim Director of Youth at St. John's United Methodist Church from August to December 2001.

After this conversation, Pastor Wright relayed these rumors to appellee Ruth (a Pastor at Oak Hill). Pastor Ruth then met with the Staff Parish Relations Committee ("SPRC") and recommended that Patton be terminated from his position as Oak Hill's Director of Youth Ministries. Pastor Wright informed Patton of the decision. Shortly beforehand, Patton had discovered Pastor Wright's handwritten notes laying on the church photocopy machine.

In a subsequent letter to two concerned members of the congregation, the committee chairwoman wrote,

> Please know that this committee and your pastors share your concern for the youth program. . . . A search for a new youth director will begin after the first of the year. . . . Before any action was taken, the Pastors discussed the situation with the District Superintendent and sought the backing of the SPRC, . . . [which] unanimously voted to accept the recommendation to support the decision reached by [Jones], [Wright], and myself. . . . I can assure you that [we] approached this decision prayerfully and in the best interests of the church. . . .

Patton also alleged that the chairwoman told a member of the congregation who asked about Patton's termination that, "It is really bad" and "We had to get him out before something happened at our church," and that Pastor Ruth responded to a member's question by stating, "[Patton] knows why he was fired" and "he wouldn't want anyone else to know."

Patton sued the Church, claiming it was liable for defamation and tortious interference with an employment contract.[3] The Church defendants filed a joint motion to dismiss, which was granted by the trial court. This appeal followed. The sole question presented on appeal is whether,

---

[3] Patton did not sue the chairwoman in her individual capacity but instead named the Conference, asserting that the chairwoman acted as its agent.

4

based on First Amendment principles, the trial court correctly determined that it lacked subject matter jurisdiction.

## ANALYSIS

*Free Exercise Clause*

The First Amendment provides in relevant part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. The Establishment and Free Exercise Clauses apply to the states by incorporation through the Fourteenth Amendment. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 8 (2004).

The Supreme Court interpreted the basis of the Free Exercise Clause at issue here in *Watson v. Jones*, 80 U.S. 679, 728-33 (1872). In often-quoted language, the Court held that "civil courts exercise no jurisdiction . . . where a subject-matter of dispute [is] strictly and purely ecclesiastical in its character," such as disputes "concern[ing] theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required." *Id*. at 733. Instead, civil courts are to accept "as final, and as binding on them" the decisions of an ecclesiastical institution on such matters. *Id*. at 728. "[I]t would be of vain consent," the Court held, "if anyone aggrieved by one of [an ecclesiastical institution's] decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance." *Id*. at 730. In part, this is because ecclesiastical institutions "are the best judges of what constitutes an offense against the word of God" and "of matters of faith, discipline, and doctrine; and civil courts,

5

if they should be so unwise to attempt to [decide such matters], would only involve themselves in a sea of uncertainty and doubt." *Id*. at 732 (citations omitted).

In the 135 years since *Watson*, many courts have applied these principles—often referred to as the "ecclesiastical abstention doctrine"—to cases concerning employment decisions by religious institutions.[4]  These cases have consistently held that civil courts lack subject matter jurisdiction to decide such controversies if the employment decision concerns a member of the clergy or an employee in a ministerial position.  *See, e.g.*, *Starkman v. Evans*, 198 F.3d 173, 176 (5th Cir. 1999); *Green v. United Pentecostal Church Int'l*, 899 S.W.2d 28, 30 (Tex. App.—Austin 1995, pet. denied).[5]  This is known as the "ministerial exception."  *See Bryce v. Episcopal Church*, 289 F.3d 648, 656-57 (10th Cir. 2002) ("ministerial exception cases rely on a long line of Supreme Court cases affirming the church autonomy doctrine, which protects the fundamental right of churches to decide for themselves matters of church government, faith, and doctrine").

The "ecclesiastical abstention doctrine" provides a broader analysis that encompasses the "ministerial exception."  The ecclesiastical abstention doctrine prevents secular courts from reviewing many types of disputes that would require an analysis of "theological controversy, church

---

[4]  Because these constitutional concepts have been discussed more extensively by the federal courts, we will look to the federal opinions that are "logically persuasive and well-reasoned" for guidance, although not binding.  *See Davenport v. Garcia*, 834 S.W.2d 4, n.53 (Tex. 1992); *see also Bell v. Low Income Women of Tex.*, 95 S.W.3d 253, 266 (Tex. 2002).

[5]  Although the First Amendment prohibits civil courts from exercising jurisdiction over purely ecclesiastical matters involved in church-related disputes, the First Amendment does not forbid civil courts from adjudicating property rights of the church or its members, so long as such rights can be determined by the application of "neutral principles of law." *Jones v. Wolf*, 443 U.S. 595, 602-04 (1979); *Hutchinson v. Thomas*, 789 F.2d 392, 396 (6th Cir. 1986); *Voice of Cornerstone Church Corp. v. Pizza Prop. Partners*, 160 S.W.3d 657, 671-73 (Tex. App.—Austin 2005, no pet.); *Dean v. Alford*, 994 S.W.2d 392, 395 (Tex. App.—Fort Worth 1999, no pet.).

6

discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required." *Watson*, 80 U.S. at 733.[6] In cases relying on the ecclesiastical abstention doctrine, courts consider the substance and nature of the plaintiff's claims to determine whether the First Amendment prevents subject matter jurisdiction. *See*, *e.g.*, *Williams v. Gleason*, 26 S.W.3d 54, 58-60 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

More narrowly, if the claim challenges a religious institution's employment decision, the sole jurisdictional inquiry is whether the employee is a member of the clergy or otherwise serves a "ministerial" function. *See Alicea-Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698, 703-04 (7th Cir. 2003) (declining to consider whether substance of claim was secular in nature because only relevant question was characterization of job function). If the employee is a minister, then the "ministerial exception" applies, preventing secular review of the employment decision without further question as to whether the claims are ecclesiastical in nature. *See Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1167-68 (4th Cir. 1985); s*ee also Combs v. Central Tex. Annual Conference of the United Methodist Church*, 173 F.3d 343, 350 (5th Cir. 1999) (employment claims by ministers "necessarily intrude into church governance in a manner that would be inherently coercive, even if the alleg[ations] [] were purely nondoctrinal"); *Abrams v. Watchtower Bible & Tract Soc'y*, 715 N.E.2d 798, 803 (Ill. App. 1999) (review of ecclesiastical decisions, "particularly those pertaining to the membership or hiring and firing of clergy, are in themselves an 'extensive inquiry' into religious law and practice, and therefore, forbidden by the

---

[6] *See*, *e.g.*, *Lacy v. Bassett*, 132 S.W.3d 119, 124-25 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (doctrine used to resolve issue of whether congregation member had right to access church financial records, not involving employment decision); *Nussbaumer v. Florida*, 882 So. 2d 1067, 1077 (Fla. Dist. Ct. App. 2004) (doctrine applied in context of clergy communications privilege).

First Amendment"). The reason for this special rule for employment decisions about ministers is because

> [t]he relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose. Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern. . . .
>
> [Inquiry into a church's decision regarding the] employment relationship existing between [] a church and its minister would result in an encroachment by the State into an area of religious freedom which it is forbidden to enter by the principles of the free exercise clause of the First Amendment.

*McClure v. Salvation Army*, 460 F.2d 553, 558-60 (5th Cir. 1972) (establishing ministerial exception based on general principle espoused in *Watson*, 80 U.S. at 733, that secular courts lack subject matter jurisdiction to review ecclesiastical matters).

Thus, in resolving whether the trial court had subject matter jurisdiction over Patton's claims, we will first address whether Patton's job function was "ministerial." If so, then pursuant to the ministerial exception, Patton's claims for defamation and tortious interference are not subject to secular review.

***Whether Patton's Job was "Ministerial"***

Whether an employee of a religious institution is a "minister" is a question of law for the court. *Starkman*, 198 F.3d at 176. The ministerial exception has not been limited to members of the clergy. *Rayburn*, 772 F.2d at 1169. Rather, it "encompasses all employees of a religious institution, whether ordained or not, whose primary functions serve its spiritual and pastoral mission." *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 463 (D.C. Cir. 1996). An employee's job

title is not dispositive. *Alicea-Hernandez*, 320 F.3d at 704 n.4. Instead, we must consider the realities of the "function of the position at issue" to determine whether the position is ministerial in nature. *EEOC v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795, 801 (4th Cir. 2000). "As a general rule," an employee's position will be considered "ministerial" if his or her "primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship" or if the "position is important to the spiritual and pastoral mission of the church." *Rayburn*, 772 F.2d at 1169. However, the "exception would not apply to employment decisions concerning purely custodial or administrative personnel . . . [w]here no spiritual function is involved." *Roman Catholic Diocese*, 213 F.3d at 801.

The Fifth Circuit articulated a three-part test in *Starkman v. Evans* to determine whether an employee's primary duties are ministerial in nature: (1) "whether employment decisions regarding the position at issue are made 'largely on religious criteria,'" (2) "whether the plaintiff was qualified and authorized to perform the ceremonies of the Church," and (3) "probably most important is whether [plaintiff] 'engaged in activities traditionally considered ecclesiastical or religious.'" 198 F.3d at 176-77 (citations omitted). The *Starkman* court held that it is "sufficient" to deem an employee's function "ministerial" if only the third prong is satisfied. *Id*. at 177 (choir director was minister because religious "music constitutes a form of prayer that is an integral part of worship").

Many courts have analyzed whether a particular employee qualifies as a "minister" using the general standards set forth in *Rayburn* and the "primary duties" test articulated in *Starkman*. Nonetheless, the parties here have not cited, nor have we found, any case presenting the exact question at issue in this case—whether a Director of Youth Ministries, who does not preach

9

or teach but instead administers and oversees the church's youth-group activities and fundraising, holds a "ministerial" position.  Thus, we review the types of employees who have and have not been deemed "ministers" in other cases.[7]

We find particularly instructive the cases involving positions that are partly administrative in nature and do not require the employee to participate in worship activities or to teach religious doctrine (unlike positions traditionally considered "ministerial," such as reverends,

---

[7] *See, e.g., EEOC v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795, 801 (4th Cir. 2000) (Director of Music Ministry was minister because "music is a vital means of expressing" religious beliefs and employee was a "visible . . . leader of the congregation"); *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 457 (D.C. Cir. 1996) (nun was "functional equivalent of a minister"); *Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1165, 1169 (4th Cir. 1985) ("associate in pastoral care intern" was minister because position involved "evangelical, liturgical, and counseling responsibilities"); *Smith v. Raleigh Dist. of N.C. Conference of the United Methodist Church*, 63 F. Supp. 2d 694, 706 (E.D.N.C. 1999) (church receptionist and secretary were "secular, lay employees who performed non-religious, administrative tasks); *Shirkey v. Eastwind Cmty. Dev. Corp.*, 941 F. Supp. 567, 577 (D. Md. 1996) ("community developer" for non-profit Methodist group was not minister because tasks of developing economy, reducing unemployment, and improving quality of life in community were secular in nature); *Turner v. Church of Jesus Christ of Latter-Day Saints*, 18 S.W.3d 877, 889-96 (Tex. App.—Dallas 2000, pet. denied) ("missionary" was minister because essential tasks were to preach gospel and perform baptisms); *Dean*, 994 S.W.2d at 395 (Baptist pastor was minister); *Tran v. Fiorenza*, 934 S.W.2d 740, 744 (Tex. App.—Houston [1st Dist.] 1996, no pet.) (Catholic priest was minister); *Green v. United Pentecostal Church Int'l*, 899 S.W.2d 28, 30 (Tex. App.—Austin 1995, pet. denied) (Pentecostal reverend was minister); *see also Weissman v. Congregation Shaare Emeth*, 839 F. Supp. 680, 682 (E.D. Mo. 1993) (claims by Temple Administrator, whose position was both secular and religious, were barred from review by First Amendment because would require review of ecclesiastical matters); *Williams v. Gleason*, 26 S.W.3d 54, 59-60 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (church's discipline of Sunday-school teacher was ecclesiastical matter); *Patterson v. Southwest Baptist Theological Seminary*, 858 S.W.2d 602, 605 (Tex. App.—Fort Worth 1993, no writ) (seminary's termination of theology professor was ecclesiastical matter).

priests, nuns, missionaries, and the like).  In *Alicea-Hernandez v. Catholic Bishop of Chicago*, the Hispanic Communications Manager for the Catholic church was responsible for "press secretary" duties including: composing media releases, correspondence, and church publications; developing relationships with the Hispanic media and community; and translating church materials into Spanish. 320 F.3d at 703-04.  Her duties did not include participating in worship activities or religious teaching. *Id*.  Although Alicea-Hernandez's duties were facially administrative, the Seventh Circuit concluded that her position was ministerial in nature because, ultimately, her role was critical in disseminating the church's message, and the "[d]etermination of whose voice speaks for the church is *per se* a religious matter."  *Id*. at 704 (citations omitted).

Similarly, in *Pardue v. Center City Consortium Schools of the Archdiocese of Washington, Inc.*, the principal of a Catholic school was deemed a "minister," although she claimed to function only in an administrative capacity and was not responsible for leading any worship activities or teaching religious classes.  875 A.2d 669, 677 (D.C. App. 2005).  The court held that, as "chief administrator . . . she would certainly be expected to perform numerous duties—secular in appearance—designed to meet public licensing requirements and to maintain the standing of the institution as a school.  But she was also . . . answerable to the religious authorities for providing, in a myriad of ways not reducible to a listing of tasks, 'spiritual leadership in and for the school community.'" *Id*.; *see also Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 309 (4th Circ. 2004) ("mashgiach," who was responsible for maintaining kosher kitchen, was minister "given the importance of dietary laws to the Jewish religion").

Patton's position as Director of Youth Ministries undoubtedly included several administrative duties, such as coordinating the transportation, logistics, and other travel

arrangements for youth outings and gatherings. Also, Patton was not ordained, and it appears from his affidavit that, as Director of Youth Ministries, Patton did not participate in worship services or ceremonies, had no responsibility for the music or liturgy, did not assist with the confirmation of youth, and was not required to teach religious classes or have religious training.

Yet, by his own testimony, Patton was responsible for "organizing" these events, meaning that he made decisions on behalf of the church about what activities the members of its youth ministry would participate in. The purpose of a church organizing a youth-group retreat is to bring people together in fellowship, often coupled with religious worship or reflection. Even if Patton was not teaching the doctrine himself, he testified that he was actively participating as a chaperone. Organizing and chaperoning these events for the youth ministry are activities that furthered the church's mission, which went beyond purely secular tasks such as booking a chartered bus, collecting payments from the participants, or reserving cabins for a retreat. Furthermore, Patton averred that he "managed the budget for the youth program." Had Patton been responsible merely for accounting, this function might be viewed as solely secular because he would not have any discretion over the use of church funds. But, as the director of the program who "managed" the budget, Patton was authorized to decide how the church's money was best used in furtherance of ministering to its youth. Because Patton was responsible for deciding what activities the church's youth group would participate in and how the program's money would be spent, he was "answerable to the religious authorities for providing, in a myriad of ways not reducible to a listing of tasks, 'spiritual leadership in and for the [youth ministry].'" *See Pardue*, 875 A.2d at 677.

Notably, Patton's affidavit also states that he "performed fundraising duties" and "recruited participants" for the program. There is no question that asking people to give their time

12

and money to support activities of the youth ministry is a function that is "important to the spiritual and pastoral mission of the church," especially in light of the fact that Patton was also responsible for deciding how to use that money and how to organize those events. *See Rayburn*, 772 F.2d at 1169. In fulfilling these duties, Patton would be directly communicating the mission of the program to individuals and encouraging them to participate either financially or physically.

Thus, even accepting Patton's allegations as true, it is apparent on the face of his pleadings that he was acting both as the "voice" of the youth ministry and serving as a "primary agent" of the church. *See Davies*, 158 S.W.3d at 56. "Determin[ing] whose voice speaks for the church is *per se* a religious matter," *Alicea-Hernandez*, 320 F.3d at 704, and determining who will serve as a "primary agent by which a church seeks to fulfil its purpose" is precisely the type of ecclesiastical decision that the First Amendment intends to protect. *Dean v. Alford*, 994 S.W.2d 392, 395 (Tex. App.—Fort Worth 1999, no pet.); *see also Watson*, 80 U.S. at 733. Considering the *Starkman* "primary duties" test, then, (1) the church's employment decision regarding Patton's position would be based 'largely on religious criteria,' and (2) Patton's organizing of—as well as his budgeting, fundraising, and recruiting participants for—youth ministry activities are things "traditionally considered [to serve an] ecclesiastical or religious" purpose. *See* 198 F.3d at 176-77.[8] Accordingly we hold that, as Director of the Youth Ministry for the Oak Hill United Methodist Church, Patton functioned in a ministerial capacity.

---

[8] Although the record does not demonstrate that Patton was "qualified and authorized to perform the ceremonies of the Church," there is no requirement that all three *Starkman* factors be satisfied to determine that an employee's primary duties are ministerial.

***Whether Dismissal of Claims was Proper***

Patton asserted claims against the Church for tortious interference with an employment contract and for defamation. The tortious interference claim is, without doubt, inextricably intertwined with the Church's decision to terminate Patton from his ministerial position. Because "churches must be free to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine," the actions taken as part the Church's employment decision are ecclesiastical matters protected from secular review by the "ministerial exception" afforded under the Free Exercise Clause. *See Combs*, 173 F.3d at 350 (quoting *McClure*, 460 F.2d at 560); *Rayburn*, 772 F.2d at 1169. Thus, the trial court was correct to dismiss for a lack of subject matter jurisdiction Patton's tortious interference claim.

The dismissal of the defamation claims, however, requires further analysis. Patton's defamation claims can be divided into two groups: (1) those based on statements made among Pastors Jones, Wright, and Ruth and the Staff Parish Relations Committee during their meeting regarding Patton's termination, including Wright's handwritten notes from this meeting, and (2) those based on statements made by the committee chairwoman and by Pastor Ruth in response to questions from members of the congregation who were concerned about the status of Patton's employment as the Director of Youth Ministries. Like the tortious interference claim, the first group of allegedly defamatory statements were undoubtedly made as part of the Church's employment decision and, therefore, were properly dismissed for a lack of subject matter jurisdiction. *See Ogle v. Church of God*, 153 Fed. App. 371, 373, 376 (6th Cir. 2005) (allegedly defamatory statements made in report by church committee recommending termination of bishop were protected by First Amendment from secular review); *Higgins v. Maher*, 258 Cal. Rptr. 757, 761 (Cal. Ct. App. 1989)

14

(because complained-of torts, including defamation, "occurred as inseparable parts of a process of divestiture of priestly authority," court refused to "sever them from the privileged aura of . . . ecclesiastical exemption").

Regarding the second group of allegedly defamatory statements, however, Patton argues that they do not involve ecclesiastical matters because they were made after the employment decision was final. We disagree. Although we recognize that the "Free Exercise Clause has never immunized clergy or churches from all causes of action alleging tortious conduct," *Tilton v. Marshall*, 925 S.W.2d 672, 677 (Tex. 1996),[9] we find ample support for the conclusion that allegedly defamatory statements made in connection with a church's decision to terminate a minister's employment are protected from secular review, even if the statements do not expressly involve religious doctrine or are not made prior to the church's decision.[10]

---

[9] In *Tilton*, after recognizing that "religious groups may be held liable in tort for secular acts," the court went on to discuss the otherwise broad protection afforded to the actions of a religious institution by the ecclesiastical abstention doctrine. *See Tilton v. Marshall*, 925 S.W.2d 672, 677-79 (Tex. 1996) (citation omitted) (evangelist pastor's promises that television viewers' prayers would be answered if they sent money, even if insincere, were not subject to secular review because they involved "statements of religious doctrine"). *Id*. at 679.

[10] *See*, *e.g.*, *Hutchison*, 789 F.2d at 393, 396 (minister's defamation claim based on church's statement "that he had become 'unappointable'" involved "internal church discipline . . . governed by ecclesiastical rule"); *Jacobs v. Mallard Creek Presbyterian Church, Inc.*, 214 F. Supp. 2d 552, 554, 557 (W.D.N.C. 2002) (church's statement "that allegations had been brought against [pastor]," which was communicated to congregation after pastor had resigned, were protected from secular review because would require court "to inquire into the church's decisions regarding its own internal management, and discipline of its clergy); *Downs v. Roman Catholic Archbishop*, 683 A.2d 808, 812 (Md. 1996) (if alleged defamation "occurs in the context of, or is germane to, a dispute over the plaintiff's fitness or suitability to . . . remain a part of the clergy, [] it is difficult to see how the forbidden inquiry [into ecclesiastical matters] could be avoided"); *Bourne v. Center on Children, Inc*. 838 A.2d 371, 380 (Md. Ct. Spec. App. 2003) (allegedly defamatory letter sent to congregation members about minister, after minister had been terminated, protected by First Amendment from secular review because it "regard[ed] appellant's performance as a minister"); *Jae-Woo Cha v.*

15

In *Heard v. Johnson*, a Baptist church became dissatisfied with the services of its pastor, Johnson, and attempted to terminate his employment. 810 A.2d 871, 875 (D.C. App. 2002). When Johnson refused to cede his position, some congregation members formed a "Coalition of Concerned Members," which "produced an eighty-five page manual documenting the grievances against Johnson, the reasons for his dismissal as pastor, and the attempts the congregation had made to remove Johnson as pastor." *Id*. Johnson claimed this was defamatory. *Id*. In determining that Johnson's defamation claim was outside the court's subject matter jurisdiction, the court provided a thoughtful analysis of the current state of the law on this issue. In relevant part, the court stated that:

> In the specific area of the church-minister relationship, other courts have expanded the universe of claims that do not overcome the First Amendment protections to include . . . a variety of common law claims. . . .
>
> Under most circumstances, defamation is one of those common law claims that is not compelling enough to overcome First Amendment protection surrounding a church's choice of pastoral leader. When a defamation claim arises entirely out of

---

*Korean Presbyterian Church*, 553 S.E.2d 511, 516 (Va. 2001) (pastor's "allegations of defamation against [church] cannot be considered in isolation, separate and apart from the church's decision to terminate his employment. . . . [M]ost courts that have considered the question whether the Free Exercise Clause divests a civil court of subject matter jurisdiction to consider a pastor's defamation claims against a church and its officials have answered that question in the affirmative.") (citations omitted); *see also Bryce v. Episcopal Church*, 289 F.3d 648, 658 (10th Cir. 2002) (church's statements about minister's sexual orientation, which were alleged to constitute sexual harassment, although offensive and perhaps incorrect, were "not actionable" because they were "religious dialogue between a minister and his parishioners [about] an employee of the church subject to its internal governance procedures"); *Klagsbrun v. Va'ad Harabonim*, 53 F. Supp. 2d 732, 734, 742 (D. N.J. 1999) (flyer distributed to organization of rabbis about Jewish parishioner's failure to comply with orthodox divorce procedures not actionable defamation because truth or falsity of statements was grounded in religious doctrine); *Schoenhals v. Mains*, 504 N.W.2d 233, 236 (Minn. App. 1993) (defamatory statements made to congregation about dismissed members were not actionable, even though content of statements was not explicitly religious and statements were made after dismissal was complete); *Rasmussen v. Bennett*, 741 P.2d 755, 756, 759 (Mont. 1987) (same).

16

a church's relationship with its pastor, the claim is almost always deemed to be beyond the reach of civil courts because resolution of the claim would require an impermissible inquiry into the church's bases for its action [compiling string cite of relevant cases].

In most of these cases, the alleged defamatory statements did not overtly express any religious principles or beliefs, but all the actions resulted from conflicts "confined within" the churches involved. Furthermore, the courts found that it was impossible to consider the plaintiffs' allegations of defamation "in isolation, separate and apart from the church[s'] decision to terminate [the plaintiffs'] employment." "Questions of truth, falsity, malice, and the various privileges that exist often take on a different hue when examined in the light of religious precepts and procedures that generally permeate controversies over who is fit to represent and speak for the church." Examining such controversies is precisely the kind of inquiry that is forbidden to civil courts since "whose voice speaks for the church is *per se* a religious matter."

This is not to say that religious organizations are immune from all tort claims arising out of employment decisions relating to their pastors. Torts such as battery, false imprisonment or conversion probably would fall within the exception to church immunity set out in *Sherbert* [*v. Verner*, 374 U.S. 398, 403 (1963)] because they pose a "substantial threat to public safety, peace or order." It is also conceivable that torts such as defamation, infliction of emotional distress, and invasion of privacy might be so unusual or egregious as to fall within the *Sherbert* exception. . . .

In light of all the foregoing, we hold that constitutional protections afforded by the Free Exercise clause (prohibiting civil court interference in disputes between ministers and churches) extend to defamation claims, when: (1) such a claim flows entirely from an employment dispute between a church and its pastor so that consideration of the claim in isolation from the church's decision as to the pastor is not practical, (2) the alleged "publication" is confined within the church, and (3) there are no unusual or egregious circumstances. This, then, is the outline of the constitutional shadow on our subject matter jurisdiction over such defamation cases.

*Id*. at 884-85 (citations omitted).

Similarly, in *Yaggie v. Indiana-Kentucky Synod*, the court determined that allegedly defamatory statements, much like those at issue in the instant case, were not within the court's subject matter jurisdiction. 860 F. Supp. 1194, 1198 (W.D. Ky. 1994). Yaggie was a pastor who

17

was "advised" to resign by a church committee. *Id*. at 1196. A report about this decision was given to the congregation. *Id*. at 1197. In response to questions about the committee's recommendation, a bishop responded to members of the church that, "It means Pastor Yaggie's going to [get] psychiatric treatment and evaluation." *Id*. Yaggie claimed the bishop's response was defamatory. *Id*. The court concluded that, although the "statements do not express any religious principles or beliefs," they were ecclesiastical matters "concerning the [church's] employment relationship of its minister. . . . If truth were a defense to the defamation claim, we presumably could face inquiry into a determination of the minister's effectiveness. . . . [T]his is precisely what the First Amendment prohibits." *Id*. at 1198-99.

Here, the chairwoman of the committee that recommended Patton's termination expressed to members of the congregation that the "decision [was approached] prayerfully and in the best interests of the church." She also allegedly told members that "It is really bad" and "We had to get him out before something happened at our church." Furthermore, Pastor Ruth is alleged to have responded to a member's question by stating, "[Patton] knows why he was fired" and "he wouldn't want anyone else to know." Although the latter statements do not, on their face, implicate religious doctrine, a determination of the truth or falsity of these statements would require an inquiry into the church's reasons for terminating Patton from his position as the Director of Youth Ministries. As in *Heard,* 810 A.2d at 884-45, and *Yaggie*, 860 F. Supp. at 1198-99,[11] this is precisely the type of inquiry protected from secular review by the ecclesiastic abstention doctrine. Furthermore, the three-part test set-forth in *Heard* guides our decision because (1) Patton's claim

---

[11] *See also*, infra, cases discussed at footnote 10.

18

"flows entirely from an employment dispute between a church and its pastor so that consideration of the claim in isolation from the church's decision as to the pastor is not practical, (2) the alleged 'publication' is confined within the church,[12] and (3) there are no unusual or egregious circumstances" surrounding the statements.[13] *See* 810 A.2d at 845.

A case discussed by both parties, *Drevlow v. Lutheran Church*, is distinguishable. *See* 991 F.2d 468 (8th Cir. 1993). In *Drevlow*, a pastor's former employer (the Synod) placed a false document in his file claiming that Drevlow's spouse had been previously married. *Id*. at 469. The court determined that Drevlow's defamation claim based on this document was viable for review because it was not connected to the church's determination about "his fitness as a minister." *Id*. at 471-72. Patton's claims, however, arise from statements directly related to the Church's decision to terminate his employment based on the Church's perception that he was unfit.

---

[12] Although not a bright-line rule, some courts have distinguished between defamatory remarks published to members of the church versus communications with third parties. In *Turner v. Church of Jesus Christ of Latter-Day Saints*, all of the minister's employment-related claims were deemed "ecclesiastical matters" protected from review, except for his defamation claim. 18 S.W.3d at 896. *Turner* is distinguishable from the instant case because, there, the allegedly defamatory statements were made to the minister's grandparents, as opposed to being internal statements made by the church in connection with its employment decision. *Id*. In *Kliebenstein v. Iowa Conference of the United Methodist Church*, the court highlighted the importance of such a distinction. 663 N.W.2d 404, 406 (Iowa 2003). The court held that the church member's defamation claim was subject to secular review because the statements had been published to the entire community, noting that the claim would not "enjoy viability had the matter been divulged solely to the members of Shell Rock UMC." *Id*.

[13] In *Tran v. Fiorenza*, the court acknowledged that a minister's defamation claims against a church may be subject to review if the statements "overstep the bounds of the authority's administrative duties" and "are clearly intended to defame or inflict emotional distress." 934 S.W.2d 740, 744 n.2 (Tex. App.—Houston [1st Dist.] 1996, no pet.). Just as in *Tran*, however, the defamation claims here are not that type, but instead "arise from [the] divestiture of priestly authority" and "are inseparable from the privileged aura of ecclesiastical exemption." *Id*. at 744.

19

Patton's single issue is overruled.

**CONCLUSION**

The trial court properly dismissed Patton's claims for tortious interference and defamation because they arose from actions taken and communications made in connection with the Church's decision to terminate Patton from a "ministerial" position, and the First Amendment prohibits secular review of a church's employment decisions about its ministers. *See Rayburn*, 772 F.2d at 1169. Accordingly, because the trial court lacked subject matter jurisdiction to review these claims, we affirm the trial court's dismissal.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed: July 28, 2006