J-S17012-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| FATHER JIM TRACY | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| ANNETTE O'BELL, KEVIN PITTACK AND ROBERT BUFANO | |
| Appellee | No. 1509 MDA 2020 |

Appeal from the Judgment Entered October 27, 2020
In the Court of Common Pleas of Lackawanna County
Civil Division at No: 2020-01618

BEFORE:  STABILE, J., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY STABILE, J.:          **FILED: NOVEMBER 5, 2021**

Appellant, Father Jim Tracy, appeals from the October 27, 2020 judgment entered in favor of Appellees, Annette O'Bell, Kevin Pittack and Robert Bufano.[1]  We affirm.

In this action, Appellant alleges that Appellees tortiously interfered with his contractual relationship with the Catholic Diocese of Scranton, Pennsylvania (the "Diocese"), resulting in the decision of Bishop Joseph C. Bambera to terminate Appellant's employment with the Diocese.  Appellees claim the Establishment and Free Exercise Clauses of the First Amendment to

---

[*] Retired Senior Judge assigned to the Superior Court.

[1]  Robert Bufano's name appears in the record as "Bufano" and "Bifano."  For consistency, we will use "Bufano" in accord with the caption of Appellant's complaint and this Court's appellate docket.

the United States Constitution prohibit judicial interference with the employment decisions of religious institutions. Appellant filed this civil action on March 9, 2020. He filed an amended complaint on June 5, 2020, in response to Appellees' preliminary objections. Appellees filed preliminary objections to the amended complaint on June 29, 2020, including objections under Pa.R.C.P. No. 1028(a)(1) and (4), for lack of subject matter jurisdiction and failure to state a claim, respectively. By order docketed October 27, 2020, the trial court sustained Appellees' preliminary objections. This timely appeal followed. Appellant raises a single argument. He claims the trial court erred in concluding that the constitution prohibits judicial interference in Bishop Bambera's decision to terminate Appellant's employment with the Diocese of Scranton. Appellant's Brief at 4.

The trial court summarized Appellant's allegations as follows:

> [Appellant], Father Jim Tracy ("Father Tracy"), 'who is a priest under contract with the Scranton Diocese of the Catholic Church,' has commenced this civil action against [Appellees], Annette O'Bell ("O'Bell"), Kevin Pittack ("Pittack"), and Robert Bufano ("Bufano"), who 'were members of the congregation of the Sacred Hearts of Jesus and Mary Parish which is a church under the jurisdiction of the Scranton Diocese of the Catholic Church.' Father Tracy alleges that on March 1, 2019, he 'was appointed by contract' to be the priest and administrator for Sacred Hearts of Jesus and Mary Parish in Jermyn, 'and therefore, had a commercially advantageous relationship with the Scranton Diocese.' He asserts that prior to his assignment to that parish, O'Bell, Pittack, and Bufano 'exerted influence over the parish activities,' and as 'an employee of the parish,' O'Bell 'exerted influence over the parish's finances.'

> Father Tracy maintains that upon assuming his duties as a priest and administrator for Sacred Hearts of Jesus and Mary

Parish, and 'while looking through a file cabinet, [he] found hundreds of dollars in cash that was hidden and unaccounted for.' He submits that '[t]he file cabinet where the cash was discovered was under the control of O'Bell,' and that 'O'Bell did not have a sufficient explanation, when asked by [Father Tracy], for why the cash would be located hidden in a file cabinet that was under her control.' Father Tracy asserts that he 'also addressed irregularities in the payment of employees to [Appellee] O'Bell.

It is alleged that O'Bell, Pittack, and Bufano, 'all demonstrated dismay at decisions that were made by [Father Tracy] due to their lack of ability to exert control they once had in the parish.' Father Tracy contends that 'following these transgressions and grievances, O'Bell, Pittack, and Bufano 'made specific defamatory and false statements to members of the parish with the intention of causing the separation of [Father Tracy] from his contractual agreement with the Scranton Diocese.' Specifically, he avers that 'O'Bell made specific untrue complaints to the Jermyn Police Department alleging harassment by [Father Tracy] that were found to be unfounded by the Department in May/June 2019,' and also 'made similar remarks about harassment to Debbie Kusmak and Jean Malek, as well as individuals in the Scranton Diocese, all for the purpose of causing separation of [Father Tracy] from his contract with the Scranton Diocese.'

Pittack allegedly 'made specific, defamatory and false statements, both orally and in writing, to Bishop Joseph C. Bambera with the intention of removing [Father Tracy] from his contractual agreement.' It is averred that Pittack forwarded emails to Father Tracy's superiors stating that Father Tracy made 'outright lies to his congregation' and 'spends the Diocese's money like a drunken sailor.' Pittack reportedly forwarded an additional email to the Diocese on May 23, 2019, claiming that Father Tracy 'spent an exorbitant amount of money on light fixtures, that were never as expensive as claimed and never even purchased by [Father Tracy].' Father Tracy generally avers that 'Bufano made specific, defamatory, and false statements, both orally and in writing, to Bish[o]p Joseph C. Bambera with the intention of separating [Father Tracy] from his contractual agreement.'

Father Tracy asserts in his amended complaint that 'Bishop Joseph C. Bambera, in reaction to the specific defamatory and false statements made by O'Bell, Pittack, and Bufano], on July 3,

2019, terminated the contract between [Father Tracy] and the Parish of Sacred Heart, and, accordingly the Scranton Diocese.' He alleges that '[t]he campaign of defamatory and false statements made by [O'Bell, Pittack, and Bufano] caused the specific monetary damages to [Father Tracy] through the termination of his contract' and in 'keeping him from obtaining other similar positions in the Scranton Diocese.' In his prayer for relief pursuant to Pa.R.C.P. [No.] 1021, Father Tracy merely 'demands a jury trial, with the opportunity for both pre-judgment and post-judgment interest, plus the costs of this action and the attorney's fees incurred in the prosecution of this action.'

Trial Court Opinion, 10/26/20, at 2-5 (record citations omitted).

Our standard of review is as follows:

[O]ur standard of review of an order of the trial court overruling or granting preliminary objections is to determine whether the trial court committed an error of law. When considering the appropriateness of a ruling on preliminary objections, the appellate court must apply the same standard as the trial court.

Preliminary objections in the nature of a demurrer test the legal sufficiency of the complaint. When considering preliminary objections, all material facts set forth in the challenged pleadings are admitted as true, as well as all inferences reasonably deducible therefrom. Preliminary objections which seek the dismissal of a cause of action should be sustained only in cases in which it is clear and free from doubt that the pleader will be unable to prove facts legally sufficient to establish the right to relief. If any doubt exists as to whether a demurrer should be sustained, it should be resolved in favor of overruling the preliminary objections.

***Durst v. Milroy Gen. Contracting, Inc.***, 52 A.3d 357, 359–60 (Pa. Super. 2012).

Appellant's 29-paragraph First Amended Complaint does not identify a cause of action. Appellant repeatedly alleges that each of the Appellees made "defamatory and false statements" as set forth above in the trial court's

- 4 -

opinion, to the public, other parishioners, and Bishop Bambera with the goal of interfering with Appellant's contractual relationship with the Diocese. First Amended Complaint, 6/5/20. at ¶¶ 9, 15-18, 21-22, 25, 27. As the trial court noted, Appellant alleges that Bishop Bambera, "in reaction to the specific defamatory and false statements made by [Appellees], on July 3, 2019, terminated the contract between [Appellant] and the Parish of Sacred Heart, and, accordingly the Scranton Diocese." *Id.* at ¶ 27. The trial court examined Appellant's complaint and concluded that Appellant sufficiently alleged the elements of tortious interference with contract,[2] but not defamation[3] or any

---

[2] The elements of tortious interference with a contractual relationship are:

> (1) [T]he existence of a contractual relationship between the complainant and a third party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of defendant's conduct.

*Empire Trucking Co. v. Reading Anthracite Coal Co.*, 71 A.3d 923, 933 (Pa. Super .2013); Restatement (Second) of Torts § 766.

[3] The Pennsylvania Judicial Code addresses the burden of proof in a defamation action:

> **(a) Burden of plaintiff.--**In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:
>
> > (1) The defamatory character of the communication.
>
> > (2) Its publication by the defendant.

*(Footnote Continued Next Page)*

- 5 -

other cause of action. Appellant does not challenge this conclusion on appeal.

Appellant's brief to this Court acknowledges that he filed this action "seeking

damages for tortious interference with his contractual relationship with the

---

> (3) Its application to the plaintiff.
>
> (4) The understanding by the recipient of its defamatory meaning.
>
> (5) The understanding by the recipient of it as intended to be applied to the plaintiff.
>
> (6) Special harm resulting to the plaintiff from its publication.
>
> (7) Abuse of a conditionally privileged occasion.
>
> **(b) Burden of defendant.--**In an action for defamation, the defendant has the burden of proving, when the issue is properly raised:
>
> > (1) The truth of the defamatory communication.
> >
> > (2) The privileged character of the occasion on which it was published.
> >
> > (3) The character of the subject matter of defamatory comment as of public concern.

42 Pa.C.S.A. § 8343. The trial court explained that "[t]he amended complaint does not state that the recipients understood the defamatory meaning of [Appellees'] communications, that [Appellees] abused a conditional privilege, or that [Appellant] suffered special harm, nor has [Appellant] even averred that he is asserting a defamation claim." Trial Court Opinion, 10/26/20, at 6-7.

- 6 -

Scranton Diocese[.]" Appellant's Brief at 5.[4]  We confine our analysis

accordingly.

The trial court found that the First Amendment bars Appellant's action.

The First Amendment provides, in part, that "Congress shall make no law

respecting an establishment of religion, or prohibiting the free exercise

thereof."  U.S. CONST. amend. I.  American courts have developed a rule of

deference to religious tribunals in matters of doctrine and faith:

> [W]henever the questions of discipline, or of faith, or
> ecclesiastical rule, custom, or law have been decided by the
> highest of these church judicatories to which the matter has been
> carried, the legal tribunals must accept such decisions as final,
> and as binding on them, in their application to the case before
> them.

***Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N.***

***Am.***, 344 U.S. 94, 113 (1952) (quoting ***Watson v. Jones***, 80 U.S. 679, 727

(1871)).  This rule, described in ***Kedroff*** and announced in ***Watson***, has

become known as the deference rule.  It arose out of disputes between and

among various church factions as to the use of church property.  Its

application has expanded to causes of action not involving church property

and, in particular, cases involving the choice of church leadership.  "The

---

[4]  In other places in his brief, Appellant seemingly refers to defamation and tortious interference as separate causes of action.  Appellant's Brief at 10. Regardless, Appellant does not argue that the trial court erred in finding that he failed to allege all the elements of a defamation cause of action.  Nor does he argue that the trial court should have permitted another amended complaint.

establishment clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own." *Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*, 565 U.S. 171, 184 (2012). The Pennsylvania Supreme Court has described the deference rule as a one "according to which civil courts decline to exercise jurisdiction over cases that would require them to decide ecclesiastical questions." *Connor v. Archdiocese of Philadelphia*, 975 A.2d 1084, 1088 (Pa. 2009).[5]

In *Connor*, a student expelled from a parochial school alleged causes of action including negligent infliction of emotional distress and defamation based on the school's communication of the expulsion. *Id.* at 1085. The plaintiff student alleged that he had a manicure set—including a pair of scissors, a letter opener, and a nail file—one or more of which he intended to use as a "bluff" in a planned altercation between the plaintiff's friends and a

---

[5] The *Hosanna-Tabor* Court noted that the ministerial exception—the specific application of the deference rule at issue in this case—is an affirmative defense rather than a jurisdictional bar to a claim. *Hosanna-Tabor*, 565 U.S. at 195 n.4. The High Court's footnote was in response to a split among federal circuits as to whether the ministerial exception is an affirmative defense or a jurisdictional bar. The trial court, citing *Hosanna-Tabor*, sustained Appellees' preliminary objections under Pa.R.C.P. No. 1028(a)(4) Trial Court Opinion, 10/26/20, at 29. Our Supreme Court's opinion in *Connor* and this Court's opinion in *Cooper v. Church of St. Benedict*, 954 A.2d 1216, 1219 (Pa. Super. 2008) treat the issue as jurisdictional. As noted in the main text, Appellees lodged preliminary objections for lack of jurisdiction and failure to state a claim. The discrepancy between the federal and Pennsylvania treatment of the ministerial exception therefore does not affect the outcome of this case.

rival group of students. *Id.* at 1086. A letter to parents of all the school's children explained that a student was caught with a "pen knife" and expelled. *Id.* at 1086-87. The plaintiff's complaint included causes of action challenging the expulsion decision and alleging defamation and negligent infliction of emotional distress based on the school's characterization—in statements both oral and written—of his expulsion. He eventually abandoned the causes of action challenging the expulsion decision. *Id.* at 1088-89.

In reviewing the history and development of the deference rule, the *Connor* Court noted that, in some cases, there are neutral principles of law that can be applied without establishing a church in violation of the First Amendment. *Id.* (citing *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969)). To that end, our Supreme Court has written:

> All disputes among members of a congregation, however, are not doctrinal disputes. Some are simply disputes as to meaning of agreements on wills, trusts, contracts, and property ownership. These disputes are questions of civil law and are not predicated on any religious doctrine. While it is true that parties may agree to settle their disputes according to their own agreed fashion, the question of what they agreed to, or whether they agreed at all, are not doctrinal and can be solved without intruding into the sacred precincts.

*Id.* at 1096 (quoting *Presbytery of Beaver-Butler of the United Presbyterian Church in the United States of America v. Middlesex Presbyterian Church*, 489 A.2d 1317, 1320-21 (Pa. 1985)).

The Supreme Court rejected this Court's conclusion that "subjecting a religious institution to civil liability for communicating to its community the occurrence of a disciplinary decision would require the court to stray into the sacred precincts[.]'" *Id.* at 1101. Instead, the Court adopted a "claim-by-claim, element-by-element approach to the question of whether to apply the deference rule." *Id.* The *Connor* Court provided specific instructions for the application of its test:

> we conclude that in determining whether to apply the deference rule, the fact-finding court must: (1) examine the elements of each of the plaintiff's claims; (2) identify any defenses forwarded by the defendant; and (3) determine whether it is reasonably likely that, at trial, the fact-finder would ultimately be able to consider whether the parties carried their respective burdens as to every element of each of the plaintiff's claims without 'intruding into the sacred precincts,'

*Id.* at 1103 (citing *Beaver-Butler*, 489 A.2d at 1321).

Ultimately, the *Connor* Court concluded that the plaintiff's defamation and negligent infliction of emotional distress claims should have survived preliminary objections. Accepting that the school's communication of the expulsion decision was motivated by religious values, the *Connor* Court concluded that the religious rationale did not require the school to allege that the plaintiff brought a weapon to school. *Id.* at 1107. "Indeed, whether the item [the plaintiff' was expelled for brining to school constitutes a weapon is a secular factual matter well within the ken of a fact-finding civil court." *Id.* at 1107. In other words, while the school's communication was motivated by

religious values, its defamatory meaning (or lack thereof) could be discerned without analysis of the underlying religious values.

We must decide whether the same is true of Appellant's tortious interference cause of action—can we analyze the propriety of Appellees' communications without intruding into the sacred precincts? We turn now to the **Connor** Court's treatment of cases involving the choice of clerical leadership.[6] "This is a special class of cases that involves the employment relationship between a religious institution and its ministerial employees in which **the courts understandably are particularly reluctant to encroach on the institution's decision-making process in selecting such employees**." **Id.** at 1108-09 (emphasis added). This application of the deference rule has come to be known as the "ministerial exception" to a civil court's ability to exercise jurisdiction over a matter related to the employment or retention of a cleric.

Prior to **Connor**, this Court had occasion to address the ministerial exception.

> Under the 'ministerial exception,' the Free Exercise Clause of the First Amendment of the United States Constitution prohibits courts from exercising subject matter jurisdiction in cases where the court's involvement would encroach on decisions made by religious institutions concerning employment of ministers. Rooted in the First Amendment's guarantee of religious freedom, the ministerial exception precludes courts from considering claims involving the employment relationship between a religious

_____

[6] The **Connor** Court addressed this line of cases to explain why the defendants' reliance on them was improper.

- 11 -

institution and its ministerial employees, based on the institution's constitutional right to be free from judicial interference in the selection of those employees.

*Cooper v. Church of St. Benedict*, 954 A.2d 1216, 1219 (Pa. Super. 2008) (citations omitted). The ministerial exception applies to persons whose "primary duties include teaching, spreading the faith, church governance, supervision of a religious order, or supervision of participation in religious ritual and worship." *Id.* at 1220. In *Cooper*, this Court reversed an order sustaining preliminary objections, concluding it was not clear from the pleadings whether the plaintiff, an "Organist/Musical Director," met the definition of a minister. *Id.* Instantly, Appellant acknowledges that he meets the definition of a minister. The question, then, is whether Appellees' statements are actionable regardless of his status as a minister.

On this point, the *Connor* Court reviewed several cases from other jurisdictions:

> When the conduct complained of occurs in the context of, or is germane to, a dispute over the plaintiff's fitness or suitability to enter into or remain a part of the clergy [] it is difficult to see how the forbidden inquiry could be avoided. Questions of truth, falsity, malice, and the various privileges that exist often take on a different hue when examined in the light of religious precepts and procedures that generally permeate controversies over who is fit to represent and speak for the church. […] The relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose. Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern.

*Connor*, 975 A.2d at 1109 (citations omitted) (quoting *Downs v. Roman Catholic Archbishop of Baltimore*, 683 A.2d 808, 812-13 (Md. Ct. Spec.

App. 1996)). Thus, in the **_Connor_** Court's words, "the concern in ministerial exception cases is not with chilling just any speech by religious institutions but, rather, that which is necessary to make an informed decision about the selection and retention of their own personnel." **_Id._** at 1110. Thus, in ministerial exception cases, unlike other cases where the deference rule is in issue, **courts will not entertain the cause of action even where the allegedly defamatory statements are of a secular nature**. **_Id._** at 1111 (emphasis added) (citing **_Yaggie v. Ind.-Ky. Synod Evangelical Lutheran Church in America_**, 860 F. Supp. 1194, 1198 (W.D.Ky. 1994)).

After **_Connor_**, the United States Supreme Court in **_Hosanna-Tabor_**, held that the ministerial exception applies to cases alleging employment discrimination. "The purpose of the exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason. The exception instead ensures that the authority to select and control who will minister to the faithful—a matter strictly ecclesiastical—is the church's alone. **_Hosanna-Tabor_**, 565 U.S. at 194-95 (citation and quotation marks omitted).

Courts in other jurisdictions have applied the ministerial exception to claims of tortious interference with contract. In **_Patton v. Jones_**, 212 S.W.3d 541, 546 (Tex. App. 2006), the plaintiff, a director of youth ministry was fired allegedly because, among other things, he had "upset congregation members by dating certain women and putting his arm around girls at church." Rumors also circulated that the plaintiff used internet pornography. **_Id._** The plaintiff

filed defamation and tortious interference with contract causes of action based on the circulation of these rumors between and among the pastor, the members of a parish committee, and a member of the congregation. *Id.* The Texas Court of Appeals reasoned that the tortious interference claim, based on communications between and among church officials and congregation members about the reasons for the plaintiff's termination was "inextricably intertwined" with the church's termination decision. *Id.* at 551. The Court concluded the ministerial exception precluded the cause of action. *Id. See also*, *Ogle v. Church of God*, 153 Fed. Appx. 371 (6th Cir. 2005) (holding that the ministerial exception barred the plaintiff's tortious interference, defamation, and other claims because they implicated the church's internal disciplinary proceedings).

In this case, Appellant alleges that Appellees were influential members of the parish community whose communications were made with the intention of prompting the bishop to terminate Appellant's employment and had the desired effect. He also notes that Appellees were not members of the church hierarchy, that their statements did not occur during a church meeting or in furtherance of an official church proceeding relating to Appellant's continued employment, and that the statements did not relate to Appellant's pastoral care. Appellant's Brief at 7. According to Appellant, "[t]he defamatory statements of lay persons against a priest are not religious controversies and, as such, should be dealt with through civil law." Appellant's Brief at 8.

Appellant claims Appellees' statements were made in retaliation to Appellant's discovery of possible malfeasance on Appellees' part; that he brought this action in response to Appellees' concerted campaign to discredit him; and that the association of Appellant and Appellees with the same religious organization is merely incidental to this lawsuit. Appellant's Brief at 11. Thus, Appellant argues that this case can and should be decided under neutral principles of law and that the trial court erred in dismissing his complaint pursuant to the ministerial exception.[7]

We conclude that Appellant's arguments lack support in the law and in the words of his own complaint:

> 7. Defendants were members of the congregation at Sacred Hearts of Jesus and Mary Parish previous to the employment of the Plaintiff and exerted influence over the parish activities previous to the Plaintiff's appointment.
>
> […]

---

[7] Appellant supports his argument with a quote from **Serbian Eastern Orthodox Diocese for U.S.A. and Canada v. Milivojevich**, 426 U.S. 696 (1976):

> To make available the coercive powers of civil courts to rubber-stamp ecclesiastical decisions of hierarchical religious associations, when such deference is not accorded similar acts of secular voluntary associations, would, in avoiding the free exercise problems petitioners envision, itself create far more serious problems under the Establishment Clause.

**Id.** at 734 (Rehnquist, J. dissenting); Appellant's Brief at 14. This quote, coming from a dissenting opinion, does not govern our analysis. The **Milivojevich** Majority held, in essence, that a state court improperly interfered with the workings of an ecclesiastical tribunal by examining the tribunals compliance with its own constitution and code.

9. Multiple following [sic] the appointment of the Plaintiff the named Defendants' [sic] began to take actions and make statements to the public regarding the Plaintiff, intending to cause harm to the Plaintiff by interfering with his contractual relationship with the Scranton Diocese.

[…]

15. […] Defendants O'Bell and Pittack and colluded [sic] on a campaign of defamatory and false statements **with the express goal to interfere with the Plaintiff's contractual agreement to be the priest Sacred [sic] Hearts of Jesus and Mary Parish with the Scranton Diocese.**

16. Defendant O'Bell made specific defamatory and false statements to members of the parish **with the intention of causing the separation of the Plaintiff from his contractual agreement with the Scranton Diocese.**

17. Defendant Pittack made specific defamatory and false statements to members of the parish **with the intention of causing the separation of the Plaintiff from his contractual agreement with the Scranton Diocese.**

18. Defendant Bufano made specific defamatory and false statements to members of the parish **with the intention of causing the separation of the Plaintiff from his contractual agreement with the Scranton Diocese.**

[…]

21. In this same period Defendant O'Bell made similar remarks about harassment to Debbie Kusmak and Jean Malek, as well as individuals in the Scranton Diocese, **all for the purpose of causing the separation of Plaintiff from his contract with the Scranton Diocese.**

22. Defendant Pittack made specific, defamatory and false statements both orally and in writing to Bishop Joseph C. Bambera **with the intention of removing Plaintiff from his contractual agreement.**

[…]

25. Defendant Bufano made specific, defamatory and false statements both orally and in writing to Bishop Joseph C.

Bambera **with the intention of separating Plaintiff from his contractual agreement.**

[…]

27. Bishop Joseph C. Bambera, in reaction to the specific defamatory and false statements made by the Defendants, on July 3, 2019, terminated the contract between the Plaintiff and the Parish of Sacred Heart, and, accordingly the Scranton Diocese.

First Amended Complaint, 6/5/20, at ¶¶ 7, 9, 15-18, 21-22, 25, 27 (emphasis added).

The complaint leaves no doubt that Appellant believes Appellees' communications to the bishop and various parishioners led to Appellant's undeserved and unjust termination from his post as a priest of Sacred Hearts of Jesus and Mary Parish and the Scranton Diocese. As our Supreme Court explained in **Connor**, albeit in dicta, the ministerial exception bars causes of action whose effect would be to chill speech relating to the selection and retention of spiritual leaders. **Connor**, 975 A.2d at 1110. Likewise, the United States Supreme Court wrote in **Hosanna-Tabor** that the ministerial exception applies to cases involving the termination of a cleric regardless of whether the termination was for a religious reason. **Hosanna-Tabor**, 565 U.S. at 194-95. Thus, the fact that Appellees allegedly defamatory statements concern secular matters—Appellant's misuse of parish funds, dishonesty toward parishioners, and an alleged incident of harassment—does not avoid the applicability of the ministerial exception.

We recognize that some cases apply the ministerial exception with the goal of facilitating free and open discourse about church leadership at church meetings. **Connor**, 975 A.2d at 1110 (citing **Seefried v. Hummel**, 148 P.3d 184, 191 (Colo. Ct. App. 2005)); **see also**, **Patton**, 212 S.W.3d at 552. We also recognize that Appellant's complaint does not allege that Appellees' statements occurred at a church meeting or as part of any formal church proceeding regarding Appellant's employment status. This does not preclude the application of the ministerial exception here, given Appellant's allegations that the communications at issue were made for the specific purpose of procuring his removal.

Furthermore, we are not persuaded by Appellant's argument that the trial court's decision clothes religious congregants with an immunity from defamation actions not enjoyed by lay members of lay organizations. Rather, the First Amendment provides special protection to communications regarding the selection and retention of religious ministers. And, as we have already explained, Appellant failed to allege a cause of action for defamation. Given the facts Appellant alleges, our result does not insulate lay people from liability from defamatory statements against clergy. Nor do we deprive clergy of the ability to seek to redress all civil wrongs committed against them by lay people. We have no occasion to address those questions. Appellant's complaint is very specific—he alleges that Appellees, through their communications with the local bishop and others, sought and successfully

procured Appellant's removal from ministry. Our holding is correspondingly narrow—Appellant's allegations are inextricably intertwined with his removal from ministry, and therefore the trial court properly sustained Appellees' preliminary objection based on the ministerial exception.

Order affirmed.

Judge Kunselman joins the memorandum.

Judge Pellegrini concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/5/2021