TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-10-00015-CV






Robert Masterson, Mark Brown, George Butler, Charles Westbrook, Richey Oliver,
Craig Porter, Sharon Weber, June Smith, Rita Baker, Stephanie Peddy, Billy Ruth Hodges,
Dallas Christian and The Episcopal Church of the Good Shepherd, Appellants


v.


The Diocese of Northwest Texas, The Rev. Celia Ellery, Don Griffis and Michael Ryan,
Appellees






FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 51ST JUDICIAL DISTRICT

NO. A-07-0237-C, HONORABLE J. BLAIR CHERRY, JUDGE PRESIDING




O P I N I O N




 This appeal arises from a property dispute among parishioners from the Episcopal
Church of the Good Shepherd ("Good Shepherd") in San Angelo, Texas. In 2006, a majority of the
Good Shepherd parishioners voted to withdraw Good Shepherd from the Episcopal Church of the
United States and the Diocese of Northwest Texas and to reorganize as the Anglican Church of the
Good Shepherd affiliated with the Diocese of Uganda, Africa; a minority voted to continue Good
Shepherd's affiliation with the Episcopal Church and the Diocese of Northwest Texas (the
"Diocese"). The Diocese and the individual appellees, The Rev. Celia Ellery, Don Griffis, and
Michael Ryan (collectively, the "Continuing Parish Leaders"), filed suit for declaratory judgment
to establish their rights to continued possession and control over the church property, which was
claimed by appellants, who are members of the withdrawing group (collectively, the "Former Parish
Leaders"). (1) The Former Parish Leaders counterclaimed with a suit to quiet title and request for
declaratory judgment that they were entitled to possession and use of the church property. The
Diocese and Continuing Parish Leaders moved for summary judgment, which the trial court granted. 
The Former Parish Leaders appeal, arguing primarily that the trial court erred in failing to properly
apply "neutral principles" of law to resolve the dispute. We will affirm the trial court's judgment.


FACTUAL AND PROCEDURAL BACKGROUND

 The Diocese is one of 111 regional dioceses of the Episcopal Church, responsible for
carrying out the Episcopal Church's ministry and mission within a geographical area that includes
Good Shepherd. In 1961, three members of the Episcopal Church purchased a tract of land in
San Angelo on which Good Shepherd was later built. The following year, they donated the
property to the Trustees of the Diocese for the purpose of establishing a mission church. In
September 1965, Good Shepherd submitted an "Application for Organization of Mission," in which
it promised to "establish and sustain the regular worship of the [Episcopal] Church, to promote its
purpose and influence" and to "conform[] to the Constitution and Canons of the General Convention
and the Diocese of Northwest Texas." Thereafter, Good Shepherd participated in the annual
Conventions for the Episcopal Diocese of Northwest Texas each year from its formation until the
present dispute arose.

 In 1974, after the Good Shepherd mission was incorporated, it achieved parish status
and was accepted into union with the Diocese. (2) The same year, the first vestry of Good Shepherd
filed articles of incorporation as the "Episcopal Church of the Good Shepherd," pledging to hold
office in accordance with the Episcopal Church Canons. Thereafter, Good Shepherd enacted
Bylaws, which provide that Good Shepherd is 


a constituent part of the Diocese of Northwest Texas and of the Protestant Episcopal
Church in the United States of America. The parish accedes to, recognizes, and
adopts the General Constitution and Canons of that Church, and the Constitution and
Canons of the Diocese of Northwest Texas and acknowledges the authority of
the same. (3)



The Bylaws further state that


[t]he Rector, Wardens and Vestry of the Church of the Good Shepherd are hereby
constituted Trustees Corporate and Politic. If the Parish be without a Rector, all
rights respecting title to properties of the Parish shall be vested in the Wardens and
Vestry with the condition that any change thereof be made with the knowledge and
written consent of the then ecclesiastical authority of the Diocese.



 In 1982, the Board of Trustees for the Diocese conveyed the property and
improvements thereon to Good Shepherd by general warranty deed for ten dollars. Title to the land
was taken in the name of the "Good Shepherd Episcopal Church." The land conveyed by the
1982 deed, along with an additional tract acquired in 2005 and the personal property of
Good Shepherd, constitute the church property subject to the instant dispute.

 In November 2006, the vestry of Good Shepherd recommended certain resolutions
that sought to withdraw Good Shepherd from the Episcopal Church and the Diocese and to begin
worship as a new, distinct, and independent church. The resolutions purported to change the name
of Good Shepherd to the "Anglican Church of the Good Shepherd," to dissolve its union with the
Episcopal Church and with the Diocese, and to revoke any trusts previously imposed on any property
of Good Shepherd in favor of the Episcopal Church, the Diocese, or the Northwest Episcopal Board
of Trustees. A majority of Good Shepherd's members voted to adopt the resolutions by a margin
of 53 to 30. In response, Wallace Ohl, Bishop of the Episcopal Church in the Diocese of Northwest
Texas, reached out to the parishioners who wished to remain with the Episcopal Church. Bishop Ohl
requested that those parishioners who wished to leave the Episcopal Church depart the premises by
January 5, 2007, and informed the Former Parish Leaders that Good Shepherd's real and personal
property was held in trust for the Diocese for the benefit of the Episcopal Church and those members
of Good Shepherd who remained faithful. Since then, the continuing parishioners of Good Shepherd
have elected a new vestry, which has been recognized by Bishop Ohl and the Diocese as the true and
proper representative of Good Shepherd. The Reverend Celia Ellery was appointed priest-in-charge,
effective January 6, 2007.

 When the Former Parish Leaders and the parishioners aligned with them refused to
vacate the premises in accordance with Bishop Ohl's order, the Diocese and Continuing Parish
Leaders filed this suit for declaratory judgment. The Former Parish Leaders filed an answer and
counterclaims, seeking to quiet title and have the trial court declare that they, the Anglican Church
of the Good Shepherd, were entitled to retain control over the property. The Diocese and Continuing
Parish Leaders moved for summary judgment on the grounds that the church property is, as a matter
of law, held in trust for the Episcopal Church and the Diocese for those members of Good Shepherd
who remain loyal and that, pursuant to Texas law and Episcopal Church Canons, the dissenting
members could not unilaterally dissolve the relationship between Good Shepherd and the Diocese
and still retain control and use of the property.

 The trial court granted the Diocese and Continuing Parish Leaders' motion for
summary judgment, declaring that the Former Parish Leaders may not divert, alienate, or use the real
or personal property of Good Shepherd, except in furtherance of the mission of the Episcopal Church
as provided by and in accordance with the Constitutions and Canons of the Episcopal Church and
the Diocese. The court further declared that:


the continuing Parish of the Good Shepherd is identified as and represented by those
persons recognized by the Bishop of the Episcopal Diocese of Northwest Texas;


the actions of the Defendants in seeking to withdraw Good Shepherd as a Parish of
the Diocese and from the Episcopal Church are void and without effect; and


all real and personal property of the Good Shepherd is held in trust for the Episcopal
Church and the Diocese.



 The Former Parish Leaders perfected this appeal.


STANDARD OF REVIEW

 We review a trial court's grant of summary judgment de novo. Mid-Century Ins. Co.
v. Ademaj, 243 S.W.3d 618, 622 (Tex. 2007). When reviewing a summary judgment, we take as true
all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any
doubts in the nonmovant's favor. Provident Life & Accident Ins. Co. v. Knott, 128 S.W.3d 211, 215
(Tex. 2003). The party moving for a traditional summary judgment bears the burden of showing that
no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. 
Id. at 216.


DISCUSSION

 In their first issue, the Former Parish Leaders argue that the trial court erred by failing
to resolve the property dispute through the application of "neutral principles of law." In their second
issue, they assert that the trial court erred in rendering summary judgment "that deferred the dispute
to a ruling by the Bishop." Specifically, the Former Parish Leaders contend that this dispute can be
resolved simply by interpreting the 1982 general warranty deed in conjunction with constitutional
and common law principles. These neutral principles of law, they argue, conclusively establish that
control of Good Shepherd vests in its members, that the majority's vote to withdraw was effective
and did not require the consent of the Episcopal Church, and that any claim to the property of
Good Shepherd by the Diocese on behalf of the Episcopal Church contradicts the terms of the
general warranty deed held by Good Shepherd. In order to adequately address these complaints, we
will first briefly outline the law governing these types of church-property disputes.

The First Amendment

 The First Amendment to the United States Constitution, applicable to the states
through the Fourteenth Amendment, Cantwell v. Connecticut, 310 U.S. 296, 303 (1940), provides
that "Congress shall make no law respecting an establishment of religion, or prohibiting the free
exercise thereof." U.S. Const. Amend. I. Government action can burden the free exercise of religion
in one of two ways: by interfering with an individual's observance or practice of a particular faith,
see, e.g., Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 532 (1993), or by
encroaching on the church's ability to manage its internal affairs, see, e.g., Kedroff v. St. Nicholas
Cathedral, 344 U.S. 94, 116 (1952). (4) Following this constitutional mandate, civil courts may
not intrude into inherently "religious" or "ecclesiastical" matters. See Westbrook v. Penley,
231 S.W.3d 389, 398-99 (Tex. 2006). In Texas, this doctrine has been referred to as one of
"ecclesiastical abstention" or "ecclesiastical exemption." See Lacy v. Bassett, 132 S.W.3d 119, 123
(Tex. App.--Houston [14th Dist.] 2004, no pet.); see also Patton v. Jones, 212 S.W.3d 541,
555 n.13 (Tex. App.--Austin 2007, pet. denied); Schismatic & Purported Casa Linda Presbyterian
Church v. Grace Union Presbytery, Inc., 710 S.W.2d 700, 703 (Tex. App.--Dallas 1986, writ ref'd
n.r.e.). The ecclesiastical-abstention doctrine stands for the proposition that the First Amendment
prohibits civil courts from exercising jurisdiction over matters concerning "theological controversy,
church discipline, ecclesiastical government, or the conformity of the members of a church to the
standard of morals required of them." Serbian E. Orthodox Diocese v. Milivojevich, 426 U.S. 696,
713-14 (1976).


[T]he First Amendment prohibits civil courts from resolving church property disputes
on the basis of religious doctrine and practice. As a corollary to this commandment,
the Amendment requires that civil courts defer to the resolution of issues of religious
doctrine or polity by the highest court of a hierarchical church organization.



Jones v. Wolf, 443 U.S. 595, 602 (1979) (citations omitted).


The Neutral-Principles Approach

 The neutral-principles approach on which the Former Parish Leaders rely can be seen
as an exception to the ecclesiastical-abstention doctrine. See Westbrook, 231 S.W.3d at 398; see also
Wolf, 443 U.S. at 602-05 (states may adopt neutral principles of law without running afoul of
First Amendment so long as resolution of ownership entails no inquiry into religious doctrine). In
the context of property-rights litigation, the neutral-principles approach confers jurisdiction on civil
courts to apply neutral principles of law "developed for use in all property disputes, which can
be applied without 'establishing' churches to which property is awarded" in violation of the
First Amendment. Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church,
393 U.S. 440, 449 (1969). In practice, this means that a court employing a neutral-principles
approach may itself interpret the governing documents of the church, deeds of conveyance, canons,
rules, and relevant statutes, so long as it does so without relying on religious precepts to resolve the
underlying dispute. See Wolf, 443 U.S. at 604.

 The neutral-principles approach was approved by the United States Supreme Court
in Maryland & Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.,
396 U.S. 367 (1970), an appeal from a state court judgment settling a local church property dispute
on the basis of the language of the deeds, the terms of the local church charters, the constitution of
the general church, and state statutes. Reflecting on the advantages inherent in the neutral-principles
approach, the Supreme Court in Jones v. Wolf noted that it "is completely secular in operation, and
yet flexible enough to accommodate all forms of religious organization and polity," as it relies
exclusively on "objective, well-established concepts of trust and property law familiar to lawyers and
judges." 443 U.S. at 603.


Furthermore, the neutral-principles analysis shares the peculiar genius of private-law
systems in general--flexibility in ordering private rights and obligations to reflect the
intentions of the parties. Through appropriate reversionary clauses and trust
provisions, religious societies can specify what is to happen to church property in the
event of a particular contingency, or what religious body will determine the
ownership in the event of a schism or doctrinal controversy. In this manner, a
religious organization can ensure that a dispute over the ownership of church
property will be resolved in accord with the desires of the members.



Id. at 603-04.

 But even the neutral-principles approach is not "wholly free of difficulty," as "there
may be cases where the deed, the corporate charter, or the constitution of the general church
incorporates religious concepts in the provisions relating to the ownership of property." Id. at 604. 
"If in such a case the interpretation of the instruments of ownership would require the civil court to
resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by
the authoritative ecclesiastical body." Id. (citing Milivojevich, 426 U.S. at 709). Therefore, even
when a court is properly applying the neutral-principles approach, it will have to defer to decision
makers within the church to the extent that resolution of the property dispute overlaps with
ecclesiastical matters. See id.; Westbrook, 231 S.W.3d at 399 ("[I]f interpretation of the instruments
of ownership would require the court's resolution of a religious controversy, the court must defer to
ecclesiastical resolution of the doctrinal issue.").

 An alternative to neutral principles is the approach the Supreme Court first articulated
in Watson v. Jones, 80 U.S. 679 (1872). Under Watson, civil courts simply enforce the property
decisions made by the relevant governing body within the church without inquiring whether that
body has power under religious law to control the property in question. 80 U.S. at 722-24; see 
Maryland & Va. Eldership of the Churches of God, 396 U.S. at 368-69 (Brennan, J., concurring). 
The gist of this approach is that people who unite themselves to a church organization are seen to
do so with an implied consent that intrachurch conflicts, including property disputes, will be decided
by the church. See Watson, 80 U.S. at 722. Under the Watson "principle of government" or
"compulsory deference" approach,


civil courts review ecclesiastical doctrine and polity to determine where the church
has placed ultimate authority over the use of the church property. After answering
this question, the courts would be required to determine whether the dispute has been
resolved within that structure of government and, if so, what decision has been made. 
They would then be required to enforce that decision.



Wolf, 443 U.S. at 605 (internal quotation marks and citations omitted). Such a rule of compulsory
deference does not necessarily involve less entanglement of civil courts in matters of religious
doctrine, however, because "civil courts would always be required to examine the polity and
administration of a church to determine which unit of government has ultimate control over church
property." Id. at 605. In some cases, "the locus of control would be ambiguous," requiring "a
careful examination of the constitutions of the general and local church" and resulting in "a
searching and therefore impermissible inquiry into church polity." Id. Nevertheless, as Jones
v. Wolf makes clear, it remains the rule that under any approach, civil courts must accept as binding
a church adjudication regarding "questions of discipline, or of faith, or ecclesiastical rule, custom,
or law." Id. at 595 (citing Watson, 80 U.S. at 727).


Neutral Principles v. Compulsory Deference: A Question of State Law

 Much of the Former Parish Leaders' briefing is devoted to their position that the trial
court was required to apply the neutral-principles approach, rather than the Watson rule of
compulsory deference, and that it failed to do so. The United States Supreme Court, however, has
expressly approved both of these methods for deciding questions of title to church property, leaving
it to the states to decide which approach to adopt. See id. at 602 ("[T]he First Amendment does not
dictate that a State must follow a particular method of resolving church disputes. Indeed, a State may
adopt any one of various approaches for settling church property disputes so long as it involves no
consideration of doctrinal matters . . . ." (internal quotation marks omitted)). In other words,
"how state courts resolve church property disputes is a matter of state law," so long as the
method a state chooses does not violate the First Amendment. Episcopal Church Cases,
198 P.3d 66, 74 (Cal. 2009).

 The Texas Supreme Court has not expressly approved a particular method to
adjudicate church-property disputes, although it has "long recognized a structural restraint on the
constitutional power of civil courts to regulate matters of religion in general." Westbrook,
231 S.W.3d at 397-98 (citing Brown v. Clark, 116 S.W. 360, 363 (Tex. 1909)). In Brown, the only
church-property dispute it has yet decided, the court was careful to sidestep any issues that fell within
the exclusive jurisdiction of the ecclesiastical judicatories, including the case-determinative question
of whether the local church possessed the authority to determine that it could enter into union with
the denominational Presbyterian Church. See 116 S.W. at 364. Having deferred to the affirmative
answer of the local church's General Assembly on that issue, the court then turned to what was
"perhaps the only question in the case of which this court has jurisdiction": how the resulting union
between the two churches affected possession and control of the church property. Id. The court
answered that question by construing the general warranty deed for the property, which was made
to the trustees of the local church, while considering the fact that the local church "was but a member
of and under the control of the larger and more important Christian organization." Id. In light of that
union, the court held that the local church had been incorporated into the Presbyterian Church and
therefore "those members who recognize the authority of the Presbyterian Church in the
United States of America are entitled to possession and use of the property." Id.

 As the Former Parish Leaders correctly point out, the analysis that the court conducted
in Brown is consistent with the neutral-principles approach. That does not mean, however, that a
Texas court is required to follow the same approach. Because the trial court was not required to
adopt any particular approach in resolving the instant dispute, see Wolf, 443 U.S. at 602, we overrule
the Former Parish Leaders' first issue asserting that the trial court erred by failing to apply neutral
principles of law. (5)

 In their second issue, the Former Parish Leaders complain that the trial court "erred
in granting summary judgment that deferred the dispute to a ruling by the Bishop." They argue that
this is error because the Episcopal Church lacks the necessary tribunals and rules to (1) adjudicate
the property dispute, (2) remove the vestry of Good Shepherd, or (3) exclude people from
membership in Good Shepherd. The deference that the trial court allegedly afforded the Diocese
would only be appropriate, they assert, if the record conclusively established that the
Episcopal Church is a "hierarchical" organization that had established the necessary institutions
to govern disputes over the government and direction of subordinate bodies. See Milivojevich,
426 U.S. at 724. According to the Former Parish Leaders, the record actually supports the
conclusion that Good Shepherd is an independent organization free from control by the
Episcopal Church hierarchy, and that the only decisions entitled to any deference are those made by
a majority of its membership to disaffiliate from the Diocese and the Episcopal Church. Before
addressing the merits of these arguments, we will first examine the context from which they arise.


Hierarchical and Congregational Churches

 In discussing the proper role for civil courts to play in adjudicating these cases,
the United States Supreme Court has analyzed two different scenarios that predominate in
church-property disputes. The first involves property held by a "religious congregation which is
itself part of a large and general organization of some religious denomination, with which it is
more or less intimately connected by religious views and ecclesiastical government." See Watson,
80 U.S. at 726. Such bodies are referred to as "hierarchical" churches. Kedroff, 344 U.S.
at 110 (defining "hierarchical churches" as "those organized as a body with other churches having
similar faith and doctrine with a common ruling convocation or ecclesiastical head"). In those cases,
"we are bound to look at the fact that the local congregation is itself but a member of a much larger
and more important religious organization, and is under its government and control, and is bound
by its orders and judgments." Watson, 80 U.S. at 726-27. "The second is when the property is held
by a religious congregation which, by the nature of its organization, is strictly independent of other
ecclesiastical associations, and so far as church government is concerned, owes no fealty or
obligation to any higher authority." Id. at 722. These are classified as "congregational churches,"
and, being independent and self-governing, are analyzed in accordance with "the ordinary principles
which govern voluntary associations." See id. at 724-25.

 Under the rule announced in Watson, the distinction between the two church
classifications is important when courts must identify the entity to which it shall defer on matters
protected from judicial scrutiny. When a dispute arises in a hierarchical church, the authority entitled
to deference on ecclesiastical matters is "the highest of the[] church judicatories to which the matter
has been carried." See id. at 727. If, however, a dispute arises in a congregational church, the
"principle of government" adopted by the church dictates who can determine the right of
control--e.g., "[i]f the principle of government in such cases is that the majority rules, then the
numerical majority of members must control the right to the use of the property." Id. at 725. Or, if
a congregational church vests power in a governing board or vestry, "then those who adhere to the
acknowledged organism by which the body is governed are entitled to use of the property." Id.

 A court applying the Watson rule of "compulsory deference" need only consider
which type of organizational model a church conforms to; once that decision is made, the court
defers to, and thereby enforces, the decision of the proper ecclesiastical authority. By arguing that
the trial court was required to give effect to the majority's vote to withdraw Good Shepherd from
the Episcopal Church and the Diocese and to reorganize as the Good Shepherd Anglican Church,
the Former Parish Leaders are implicitly invoking the deference rule in combination with the
assertion that Good Shepherd is a congregational church under the sole control of a majority of its
members. Thus, by complaining that the trial court erred in paying deference to the Diocese and
Bishop Ohl's determination that the faction aligned with the Former Parish Leaders does not, in fact,
represent Good Shepherd, they are really arguing that the court misapplied the deference rule by
characterizing Good Shepherd as a hierarchical church rather than a congregational one. In response,
the Diocese and Continuing Parish Leaders argue that the trial court correctly determined that
the Episcopal Church is hierarchical and that the parishes within the hierarchy, including
Good Shepherd, are subject to governance by the ecclesiastical head of the general church.

 Several factors are to be weighed in determining whether a church is hierarchical,
including (1) the affiliation of the local church with a parent church, (2) an ascending order of
ecclesiastical judicatories in which the government of the local church is subject to review and
control by higher authorities, (3) subjugation of the local church to the jurisdiction of a parent church
or to a constitution and canons promulgated by the parent church, (4) a charter from the parent
church governing the affairs of the local church and specifying ownership of local church property,
(5) the repository of legal title, and (6) the licensing or ordination of local ministers by the parent
church. Templo Ebenezer, Inc. v. Evangelical Assemblies, Inc., 752 S.W.2d 197, 198-99 (Tex.
App.--Amarillo 1988, no writ); see Schismatic & Purported Casa Linda Presbyterian Church,
710 S.W.2d at 702; Browning v. Burton, 273 S.W.2d 131, 133-34 (Tex. Civ. App.--Austin 1954,
writ ref'd n.r.e.).

 In the present case, the summary-judgment record establishes conclusively that the
Episcopal Church is hierarchical and that Good Shepherd is, in accordance with its bylaws and other
governing documents, a constituent part of the Episcopal Church and the Diocese. (6) Accordingly,
the Watson rule would require that the trial court and this Court defer to ecclesiastical decisions
made within the Episcopal Church hierarchy that bear on the property-ownership dispute, rather than
be bound by the views of the defecting parishioners, notwithstanding that they constituted a majority
of the members of the parish. See Milivojevich, 426 U.S. at 709. Because the trial court did not err
in deferring to decisions of the Bishop or the Diocese in light of the hierarchical nature of the
Episcopal Church, we overrule the Former Parish Leaders' second issue.

 In their third, fourth, and fifth issues, the Former Parish Leaders challenge the trial
court's declaration that their actions seeking to withdraw Good Shepherd from the Episcopal Church
are void and without effect, its finding that Good Shepherd's property is held in trust for the
Episcopal Church and the Diocese, and its alleged failure to give effect to the 1982 deed. Each of
these complaints stems from the Former Parish Leaders' initial premise that proper application of
the neutral-principles approach would necessarily have resulted in a judgment in their favor. 
Accordingly, we will address these related points together.


The Trial Court's Judgment Comports With the Neutral-Principles Approach

 Although the trial court made no findings of fact or conclusions of law that
conclusively establish which approach it adopted, it appears that the trial court did apply neutral
principles in rendering the judgment under review. The judgment itself indicates that the court
considered and interpreted a number of the documents contained in the record, as it would have done
if it were employing the neutral-principles approach. Specifically, the trial court's declaration that
"all real and personal property of the Good Shepherd is held in trust for the Episcopal Church and
the Diocese" is evidence that the trial court looked to the deed conveying the real property to
Good Shepherd, the trust provisions contained in the various Canons of the Episcopal Church and
the Diocese, and the governing documents of Good Shepherd.

 On this record, we likewise conclude that neutral principles of law mandate that the
Episcopal Church and the Diocese, not the Good Shepherd parish, have control of the property in
question. Though the deed to the property is held in Good Shepherd's name, the parish agreed from
its inception to be a part of the greater Episcopal Church and to be bound by its governing
documents. These governing documents make clear that church property is held in trust for the
Episcopal Church and may be subject to Good Shepherd's authority only so long as Good Shepherd
remains a part of and subject to the Episcopal Church and its Constitution and Canons.


Alternatively, the Trial Court Properly Applied Watson Deference

 Viewed differently, this case can be decided not on the basis of neutral principles of
real property or trust law, but by deciding which faction represents the divided local parish. There
is no question that the "Good Shepherd Episcopal Church" holds record title to the church property. 
That is the fact on which the Former Parish Leaders rely most heavily in claiming the right to control
and use the property for the new Good Shepherd Anglican church. It does not, however, resolve the
ownership dispute, as both the Former Parish Leaders and the Continuing Parish Leaders purport to
represent "Good Shepherd." And the Former Parish Leaders' contention that the congregation's vote
transformed Good Shepherd into an Anglican parish overlooks the fact that Good Shepherd remains
an entity that is recognized by the Episcopal Church and that it continues to assert ownership of the
church property held in its name.

 Thus, the essence of the dispute before us can be seen as an inherently ecclesiastical
question: which parishioners--the loyal Episcopalian minority or the breakaway Anglican
majority--represent Good Shepherd, in whose name the disputed property is held? It is not within
the jurisdiction of this Court to decide such an issue, which is inextricably linked with matters of
church discipline, membership, and faith. Instead, we are bound by the decisions of the highest
church judicatories within the Episcopal Church hierarchy to which the matter has been carried. See
Brown, 116 S.W. at 363 (citing Watson, 80 U.S. at 727). Bishop Ohl, who serves as the "chief
executive officer" in charge of both "ecclesiastical and temporal issues" and who is therefore the
highest ecclesiastical authority within the Episcopal Church hierarchy that governs the Diocese, has
determined that the Former Parish Leaders are not entitled to consider themselves members of
Good Shepherd or to control property held in Good Shepherd's name. See Patton v. Jones,
212 S.W.3d 541, 548 (Tex. App.--Austin 2006, pet. denied) (review of ecclesiastical decisions,
"particularly those pertaining to the membership[,] are in themselves an 'extensive inquiry' into
religious law and practice, and therefore, forbidden by the First Amendment" (quoting Abrams
v. Watchtower Bible & Tract Society, 715 N.E.2d 798, 803 (Ill. App. 1999) (emphasis added))). 
According to Bishop Ohl's affidavit, he has, in his capacity as "Bishop and highest Ecclesiastical
authority in the Episcopal Diocese of Northwest Texas, . . . recognize[d] the new vestry as the true
and proper representatives of the Episcopal Church of the Good Shepherd." Because we are bound
by this pronouncement, we hold that the summary-judgment evidence conclusively establishes that
the church property at issue is subject to possession and control by the Continuing Parish Leaders
of Good Shepherd and the parishioners aligned with them. (7)


Partial Conclusion

 As demonstrated by the foregoing, the trial court's judgment can be affirmed whether
we decide this appeal by applying neutral principles of law or by deferring resolution of the
determinative question of identity to the proper authorities within the Episcopal Church hierarchy. 
See Milivojevich, 426 U.S. at 709; Westbrook, 231 S.W.3d at 398. Under either methodology, giving
due deference to the Diocese's resolution of the ecclesiastical questions bearing on this appeal, we
conclude that when the Former Parish Leaders and the other parishioners aligned with them
disaffiliated from the Episcopal Church, the church property remained under the authority and
control of the Episcopal Church. Accordingly, the vote to disaffiliate was effective only as to those
members who sought to withdraw from the Episcopal Church; it did not have the effect of
withdrawing Good Shepherd itself from its union with the Episcopal Church, as the Former Parish
Leaders presume. (8) Further, having found that the Continuing Parish Leaders are entitled to
possession and use of the property, the trial court did not err in declaring that property owned by the
local Episcopal parish is held in trust for the Episcopal Church, pursuant to the Episcopal Church
Constitution and Canons. We overrule the Former Parish Leaders' third, fourth, and fifth issues.


The Former Parish Leaders' Remaining Issues

 In their sixth issue, the Former Parish Leaders argue that the trial court's judgment
declaring that the church property may be used only for the mission of the Episcopal Church violates
the First Amendment of the U.S. Constitution by entangling the court in determining the religious
question of the mission of the Episcopal Church. Because it is unsupported by any authorities or
citations to the record, this issue is waived. See Tex. R. App. P. 38.1(i); ERI Consulting Eng'rs, Inc.
v. Swinnea, 318 S.W.3d 867, 880 (Tex. 2010). Even if it were not, however, the trial court's
judgment passes constitutional muster by deferring to ecclesiastical authorities within the
Episcopal Church to define the Church's mission. The Former Parish Leaders also contend that the
judgment violates the Texas Constitution by ordering that they may not use, divert, or alienate the
real property of Good Shepherd, which constitutes a taking of private property. Given both the
failure of any governmental appropriation of the property and the fact that the property is owned by
Good Shepherd--not the parishioners who disaffiliated from it--this argument lacks merit. We
overrule the Former Parish Leaders' sixth issue.

 In their seventh issue, the Former Parish Leaders argue that the order granting
summary judgment in favor of the Diocese and the Continuing Parish Leaders is defective because
it fails to identify the property and awards the property to persons not named as parties to the suit
(namely, the vestry of the Episcopal Church of the Good Shepherd). Again, because they have failed
to adequately brief this issue by including authorities or citations to the record, it is waived. See id. 
Moreover, there is no serious question that the subject property is sufficiently identified in the
Diocese and Continuing Parish Leaders' motion for summary judgment, which was granted in its
entirety as to those claims. In addition, because it is not necessary that all members of the current
vestry of Good Shepherd be identified, those who are, including the priest-in-charge and the
wardens, can appropriately take possession of the property in accordance with the trial court's order. 
We overrule the Former Parish Leaders' seventh issue.


CONCLUSION

 Having overruled the Former Parish Leaders' issues on appeal, we affirm the
trial court's judgment.





 __________________________________________

 J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Henson and Goodwin

Affirmed

Filed: March 16, 2011
1. The individual appellants include Robert Masterson, Mark Brown, George Butler,
Charles Westbrook, Richey Oliver, Craig Porter, Sharon Weber, June Smith, Rita Baker,
Stephanie Peddy, Billy Ruth Hodges, and Dallas Christian. Good Shepherd was named as a nominal
defendant, as it was under the control of the Former Parish Leaders at the time the suit was filed. 
It is now a nominal appellant.
2. Under the Diocesan Canons, title to any property acquired by or for a mission congregation
shall be held by the Diocese "until such time as the Mission becomes a Parish." On achieving parish
status, a congregation must incorporate under the laws of Texas in order to facilitate and conduct its
affairs; "such incorporated parish shall hold title of and administer the real property and trust funds
of the Parish." If a parish is dissolved by the Diocese, "such property as it may own shall be
delivered and conveyed to the [Diocese]."
3. A number of the Canons of the Episcopal Church and the Diocese contain provisions
relating to possession and use of church property, chiefly Canon I.7.4, which recites an express trust
in favor of the denominational church: "All real and personal property held by or for the benefit of
any congregation is held in trust for this Church and the Diocese thereof in which such congregation
is located. The existence of this trust, however, shall in no way limit the power and authority of the
congregation otherwise existing over such property so long as the particular congregation remains
a part of, and subject to, this Church and its Constitution and Canons."
4. The dangers posed by civil courts probing too deeply into church affairs have been well
articulated by the Supreme Court:



First Amendment values are plainly jeopardized when church property litigation is
made to turn on the resolution by civil courts of controversies over religious doctrine
and practice. If civil courts undertake to resolve such controversies in order to
adjudicate the property dispute, the hazards are ever present of inhibiting the free
development of religious doctrine and of implicating secular interests in matters of
purely ecclesiastical concern.



Serbian E. Orthodox Diocese v. Milivojevich, 426 U.S. 696, 709-10 (1976); see also Watson
v. Jones, 80 U.S. 679, 728-29 (1872).
5. In support of their first issue, the Former Parish Leaders make a number of assertions that
they label as sub-issues, including "Texas District Courts have subject matter jurisdiction to apply
'neutral principles' of law" and "application of 'neutral-principles' [sic] to determine property
disputes is not restricted to congregational churches." Because these statements concern matters that
are not in dispute, we need not address them.
6. Briefly, the summary-judgment record details that the Episcopal Church is made up of
nearly 7,700 congregations, primarily parishes, that are organized into 111 regional dioceses. It is
governed by a General Convention and a presiding bishop, while each diocese is governed by a
diocesan convention and a bishop. The Constitutions and Canons of the Episcopal Church and each
diocese are binding on all congregations within the diocese. The Constitution of the Diocese
requires all congregations to accede in writing to the rules of the Episcopal Church as a condition
of acceptance as a parish of the Diocese. The bylaws and articles of incorporation of Good Shepherd
affirm these commitments, establishing that Good Shepherd agreed from its inception to be part of
the greater denominational church and to be bound by that church's governing instruments. The
Former Parish Leaders cite no competent summary-judgment evidence to the contrary, relying
instead on statements in one former vestry member's affidavit that "[t]he Episcopal Church does not
have control of the local parishes like other hierarchical churches appear to," that "[t]hey [sic] have
no power to assume original jurisdiction over Good Shepherd," and that "they [sic] have no power
to decide who is a voting member of Good Shepherd." Such statements, however, are legal
conclusions that are insufficient to raise a fact issue within the context of a summary-judgment
motion. Anderson v. Snider, 808 S.W.2d 54, 55 (Tex. 1991); Ellis v. Jansing, 620 S.W.2d 569, 571
(Tex. 1981); Gaines v. Hamman, 358 S.W.3d 557, 563 n.4 (Tex. 1962).
7. We note that this holding is consistent with earlier decisions of this Court and other Texas
courts, wherein possession of church property is awarded to the members of a divided hierarchical
congregation who remain loyal to the church, while "those members who renounce their allegiance
to the church lose any rights in the property involved." Green v. Westgate Apostolic Church,
808 S.W.2d 547, 552 (Tex. App.--Austin 1991, writ denied); see Brown v. Clark, 116 S.W. 360,
365 (Tex. 1909) (property belonged to congregation that remained loyal to merged, general church);
Schismatic & Purported Casa Linda Presbyterian Church v. Grace Union Presbytery, Inc.,
710 S.W.2d 700, 706-07 (Tex. App.--Dallas 1986, writ ref'd n.r.e.) (Texas law recognizes
denominational church's decision that loyal group is true representative of church; therefore, loyal
group is entitled to possession and use of all church property); Browning v. Burton, 273 S.W.2d 131,
134 (Tex. Civ. App.--Austin 1954, writ ref'd n.r.e.) ("Appellants of course had the right to withdraw
from the local church but in so doing they relinquished their rights in the abandoned church."). 
These courts have viewed the matter as "a simple question of identity" determined by identifying
which faction is the successor to the general church as it existed prior to the division. Presbytery
of the Covenant v. First Presbyterian Church, 552 S.W.2d 865, 871 (Tex. Civ. App.--Texarkana
1977, no writ) (collecting cases). The Former Parish Leaders maintain that the "question of identity
rule" is not applicable to this case because the Episcopal Church is not sufficiently hierarchical and
lacks the tribunals necessary to decide identity. Having already determined that the record
conclusively establishes the hierarchical nature of the Episcopal Church and the Diocese, we reject
these arguments.
8. Contrary to the Former Parish Leaders' assertions, the trial court's judgment imposes no
violation of the First Amendment's right of free association. The question to be resolved is not
whether the defecting parishioners have a right to withdraw from the Episcopal Church and instead
join the Anglican Communion--they clearly do--but whether they can claim title to property
belonging to the Good Shepherd parish, which, as the trial court properly determined, they cannot.