

NUMBER 13-12-00342-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

ARMANDO TORRALVA,                                                    Appellant,

v.

REV. HEATH PELOQUIN, ET AL.,                                         Appellees.

On appeal from the 319th District Court
of Nueces County, Texas.

# O P I N I O N

**Before Chief Justice Valdez and Justices Garza and Longoria
Opinion by Justice Garza**

In this case, we are asked whether the ecclesiastical abstention doctrine applies

to bar claims brought by appellant, Armando Torralva, against appellees Rev. Heath

Peloquin, Wayne Andrus, Grady Jackson, Jill Jackson, and Jessica Lenhardt. The trial

court found that the doctrine applied and that it therefore had no subject matter jurisdiction over the dispute. We affirm.

## I. BACKGROUND

Beginning in 2007, Torralva served as an associate pastor at Brighton Park Baptist Church (the "Church") in Corpus Christi, Texas. Peloquin is the Church's head pastor and Andrus is the Church's head of deacons. The other appellees are members of the Church's congregation.

Torralva initially filed suit against appellees in January 2012. An amended petition filed on March 5, 2012 alleges that Peloquin requested Torralva's resignation on or about September 1, 2011, but that Torralva refused to resign.[1] Torralva alleged that, over the next few months, Peloquin relieved him of his administrative duties and his office space in the Church. He alleged that Andrus attempted, but failed, to secure the votes of a majority of deacons to oust him from his position.

Torralva alleged that, in an effort to "destroy his character and ruin him socially and financially," appellees then "falsely accused him of producing and disseminating pornography." The allegedly false accusations were based on an email that Torralva sent to Peloquin on January 19, 2011. The body of the email stated: "Pastor Heath: Can I use this picture for the PowerPoint announcement?" Below that statement was an obscured black-and-white image apparently depicting a man and a women lying in

---

[1] As background, Torralva alleged that Church officials sought his resignation because he revealed to them that the Church had financial problems. In particular, he alleged that, from May to September of 2011, he informed Church officials "that the Church's financial condition was deteriorating and that they might have to hold a membership meeting of the church to discuss the financial options available." According to Torralva, "Peloquin apparently did not like the financial news because it reflected on his ability to run the Church and it prevented him from making an overseas trip using church funds." Torralva alleged that Peloquin and Andrus then "began a campaign to solicit negative comments in the form of letters from various members to be used as a reason to embarrass [Torralva] into resigning from his position."

2

bed.  Superimposed on the image was the following caption:  "Ignite Your Marriage at Brighton Park.  Mattress not included.  Sponsored by the South Texas Children's Ministries."  In his amended petition, Torralva asserts that the couple depicted in the image were fully clothed and that he sent the email "in jest" because the Church was "having meetings for . . . young married couples at the time."  Torralva stated that the image "was from an ad that [he] found on the internet."[2]  Torralva's amended petition included an affidavit by Torralva in which he swore to the accuracy of his allegations.

Letters by Church congregants Steve Dalton, Toni Sharif, Karen Cover, and T.O. Webb were attached to Torralva's amended petition.[3]  Dalton stated that, in November of 2011, he attended a meeting called by appellee Grady Jackson at a local Burger King.  At the meeting, Jackson showed the attendees a printed copy of Torralva's email to Peloquin.  According to Dalton, Jackson's adult daughter, appellee Jill Jackson, described the image contained in the email as pornography.  Dalton stated that appellee Lenhardt remarked:  "I think Brother Armando should resign.  I don't want him near my children or having anything to do with my children."  Dalton stated that the image he was shown was "tiny" and "so dark that at first I had a hard time knowing what I was looking at."  He said that the couple depicted in the image "did not appear to be naked but only laying on the mattress embracing each other."  Dalton stated that Jackson "told us that what he was doing, going around talking to small groups about Brother Armando, had Pastor Heath's blessing."  According to their letters, Sharif and Cover

---

[2] The version of the image contained in the record before this Court appears grainy and obscured.  It is not clear whether the individuals depicted therein are, in fact, fully clothed.  In his amended petition and on appeal, Torralva states:  "The picture was not the clear picture that [Torralva] sent [to] Peloquin but, had been altered by darkening it to the point where it was difficult to see whether the couple were fully clothed or not."  No clearer version of the image appears in the record.

[3] Torralva characterizes these letters as "affidavits."  However, with the exception of Webb's letter, the letters are not sworn and they have not been notarized.

also attended the meeting. They corroborated Dalton's account. Cover further stated that Jill Jackson said, referring to Torralva: "[W]ell we have Evil sitting in the back row of our church." Webb stated that he asked Peloquin why Torralva was not permitted to speak at a Church business meeting. According to Webb, Peloquin replied: "I have an e-mail from Armando that is so graphic that it is unfit for women and children to see."

According to Torralva's amended petition, the Church congregation voted not to remove him as associate pastor at a business meeting on January 8, 2012, and Peloquin subsequently resigned as head pastor of the Church.

Torralva asserted causes of action of defamation, conspiracy, tortious interference with contract and prospective contract, negligence, and intentional infliction of emotional distress. He asked for permanent injunctive relief and damages.

Appellees filed a plea to the jurisdiction in which they alleged that Torralva's claims are barred by the ecclesiastical abstention doctrine and ministerial exception. The plea included affidavits by each appellee. Each affidavit included the following identical statements:

> Last year it came to many members['] attention, including mine, that Mr. Torralva was rude to various church and staff members. Further, Mr. Torralva often made dirty jokes. For these reasons, among others, the [Church] Deacons and personnel committee sought to remove Mr. Torralva from his position of associate pastor.
>
> The only people I ever discussed Mr. Torralva's inappropriate behavior or dirty jokes with were other members of the [Church]. Further, these matters were discussed with other members as we, as [Church] members, were contemplating how to deal with Mr. Torralva. In other words, we were trying to decide whether to vote to terminate him or to allow him to stay on as an associate pastor with the [Church]. These were necessary discussions as my only goal was to make sure that our church community was strong. In my opinion, it is not possible to have a strong church community if the church leaders, such as an associate pastor, cannot get along with the church staff or church members.

4

Each appellee further stated that they had "never heard" any of the other appellees "ever speak about any of the foregoing issue[s] with anyone who was not a member of the [Church]."

After a hearing, the trial court granted the plea and dismissed the case. Pursuant to Torralva's request, the trial court filed findings of fact and conclusions of law.[4] The findings of fact included the following:

2.      Torralva's position as Associate Pastor was a full-time ministerial position at the Church.

. . . .

5.      There was a dispute between Torralva and the Church over the performance of Torralva's duties and his fitness for the position of Associate Pastor.

6.      Torralva's claims for conspiracy, defamation, tortious interference, negligence, and intentional infliction of emotional distress arise out of the employment dispute over Torralva's position as Associate Pastor at the Church.

. . . .

8.      The individual defendants did not publish the alleged defamatory statements to third parties outside of the church membership. Any publication of the alleged defamatory statements by the Church and the individual defendant[s] was confined within the Church community.

9.      This case does not present any unusual or egregious circumstances.

10.     The substance and nature of Torralva's tort claims is to recover for an intangible injury to his reputation and for emotional distress allegedly caused by defendants' statements and actions in connection with the employment dispute . . . .

---

[4] In the record before this Court, the findings of fact and conclusions of law are entitled "Defendant's Proposed Findings of Fact and Conclusions of Law." However, the findings and conclusions are signed by the trial court judge.

5

The conclusions of law included the following:

13. Torralva's claims for conspiracy, defamation, negligence and intentional infliction of emotional distress are inexorably intertwined with the Church's decision regarding Torralva's position at the Church and the actions the Church took in pursuit of termination of Torralva's employment.

14. Each of Torralva's claims implicate ecclesiastical matters such as church doctrine and discipline and the conformity of ministerial staff to the Church's moral standards and principles.

15. The ecclesiastical abstention doctrine and the ministerial exception apply to this case and prevent subject matter jurisdiction over the entirety of Torralva's claims.

This appeal followed.

## II. DISCUSSION

In his appellate brief, Torralva enumerates seven issues. He claims that the trial court erred by: (1) determining that the ministerial exception applied; (2) refusing Torralva's request to present sworn testimony; (3) finding that "[t]he individual defendants did not publish the alleged defamatory statements to third parties outside of the church membership"; (4) finding that "this case does not present any unusual or egregious circumstances"; (5) finding that "[t]he substance and nature of Torralva's tort claims is to recover for an intangible injury to his reputation and for emotional distress allegedly caused by defendants' statements and actions in connection with the employment dispute"; (6) concluding that the ecclesiastical abstention doctrine and the ministerial exception apply; and (7) concluding that Torralva's claims "are inexorably intertwined with the Church's decision regarding Torralva's position at the Church." Torralva addresses all seven of his issues together in his brief. We will do the same.

## A. Standard of Review

6

A plea questioning the trial court's subject-matter jurisdiction raises a question of law that we review de novo. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). Lack of jurisdiction may be raised by a plea to the jurisdiction when, as here, religious-liberty grounds form the basis of the jurisdictional challenge. *Westbrook v. Penley*, 231 S.W.3d 389, 394 (Tex. 2007). We focus first on the plaintiff's petition to determine whether the facts pled affirmatively demonstrate that subject-matter jurisdiction exists. *Id.* (citing *Miranda*, 133 S.W.3d at 226). A plea should not be granted if a fact issue is presented as to the court's jurisdiction, but if the pleadings affirmatively demonstrate an incurable jurisdictional defect, then the plea to the jurisdiction must be granted. *Id.* If the pleadings are insufficient to establish jurisdiction but do not affirmatively demonstrate an incurable defect, the plaintiff should be afforded the opportunity to replead. *Id.*

We construe the pleadings liberally in favor of the plaintiff. *Id.* at 405. If a plea to the jurisdiction challenges the existence of jurisdictional facts, the trial court may consider evidence and must do so when necessary to resolve the jurisdictional issues raised. *Miranda*, 133 S.W.3d at 227; *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000).

**B.    Applicable Law**

The ecclesiastical abstention doctrine "prevents secular courts from reviewing many types of disputes that would require an analysis of 'theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required.'" *Patton v. Jones*, 212 S.W.3d 541, 547–48 (Tex. App.—Austin 2006, pet. denied) (quoting *Watson v. Jones*, 80 U.S. 679, 733

7

(1872)); *see Westbrook*, 231 S.W.3d at 397–98; *In re Godwin*, 293 S.W.3d 742, 747–48 (Tex. App.—San Antonio 2009, orig. proceeding); *Williams v. Gleason*, 26 S.W.3d 54, 58 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). The doctrine provides that "civil courts are to accept 'as final, and as binding on them' the decisions of an ecclesiastical institution on such matters." *Patton*, 212 S.W.3d at 547 (quoting *Watson*, 80 U.S. at 728). The "ministerial exception" refers to the application of the doctrine in the employment context. *Id.* It provides that civil courts lack subject matter jurisdiction to decide cases concerning employment decisions by religious institutions concerning a member of the clergy or an employee in a ministerial position. *Id.*

The doctrine arises from the Free Exercise Clause of the First Amendment to the United States Constitution and applies to the states through the Fourteenth Amendment. *See* U.S. CONST. amends. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."), XIV. The Free Exercise Clause precludes, among other things, government action that burdens the free exercise of religion "by encroaching on the church's ability to manage its internal affairs." *Westbrook*, 231 S.W.3d at 395. "Although wrongs may exist in the ecclesiastical setting, and although the administration of the church may be inadequate to provide a remedy, the preservation of the free exercise of religion is deemed so important a principle that it overshadows the inequities that may result from its application." *Williams*, 26 S.W.3d at 59; *see In re Godwin*, 293 S.W.3d at 750 (noting that courts give "great deference to the First Amendment's freedom of religion guarantee"). To determine whether the doctrine applies, courts consider the "substance and nature" of the plaintiff's claims and the effect of a judicial resolution, and not

8

whether wrongs may go unaddressed. *See In re Godwin*, 293 S.W.3d at 750; *Patton*, 212 S.W.3d at 548.

## C.    Analysis

Each of Torralva's causes of action are based on appellees' allegedly taking action against him for conduct that they viewed as inappropriate for an associate pastor. There was no evidence adduced that Torralva's reputation was harmed outside of the Church community, nor was there evidence that appellees took any action outside the context of their deliberations regarding Torralva's fitness for service as an associate pastor with the Church. Instead, the evidence supported the trial court's findings that "[t]he individual defendants did not publish the alleged defamatory statements to third parties outside of the church membership" and that "[t]he substance and nature of Torralva's tort claims is to recover for an intangible injury to his reputation and for emotional distress allegedly caused by defendants' statements and actions in connection with the employment dispute." The pleadings and evidence established that the actions underlying Torralva's claims—specifically, appellees' assertions that Torralva distributed pornography—took place entirely within the context of Church officials' internal efforts to remove Torralva from his position. Thus, trial on Torralva's claims would require an analysis of "church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required." *Patton*, 212 S.W.3d at 48. The ecclesiastical abstention doctrine precludes subject matter jurisdiction over those causes of action. *See id.*[5]

---

[5] Torralva's claim for interference with a prospective contract is based on an allegation that "members of another church shortly after the January 8th [Church] business meeting told him they were there and heard the entire proceedings" and that he subsequently discovered he was removed from consideration for a job at another church. This allegation, however, is also based on acts allegedly taken

9

Torralva claims that the acts alleged are so "egregious" that they fall under an exception to the ecclesiastical abstention doctrine identified by the United States Supreme Court in *Sherbert v. Verner*, 374 U.S. 398, 403 (1963). He relies on *Patton*, in which the Austin court of appeals stated:

> "Torts such as battery, false imprisonment or conversion probably would fall within the exception to church immunity set out in [*Sherbert v. Verner*, 374 U.S. 398, 403 (1963)] because they pose a 'substantial threat to public safety, peace or order.' It is also conceivable that torts such as defamation, infliction of emotional distress, and invasion of privacy might be so unusual or egregious as to fall within the *Sherbert* exception."

*Patton*, 212 S.W.3d at 554 (quoting *Heard v. Johnson*, 810 A.2d 871, 875 (D.C. App. 2002)); *see Sherbert*, 374 U.S. at 403 (noting that the United States Supreme Court "has rejected challenges under the Free Exercise Clause to governmental regulation of certain overt acts prompted by religious beliefs or principles" that "posed some substantial threat to public safety, peace or order . . ."); *Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 12 (Tex. 2008) ("[R]eligious practices that threaten the public's health, safety, or general welfare cannot be tolerated as protected religious belief"). We disagree. The *Patton* court merely recognized that "torts such as defamation, infliction of emotional distress, and invasion of privacy" *may* fall within the *Sherbert* exception, but it did not hold that such torts must necessarily fall within that exception. *Patton*, 212 S.W.3d at 554. Instead, such torts are actionable notwithstanding the ecclesiastical abstention doctrine only if they pose a "substantial threat to public safety, peace or order." *Sherbert*, 374 U.S. at 403. Here, the torts alleged by Torralva do not jeopardize, in any way, public safety, peace, or order. They

within the context of the Church's internal employment procedures. It is barred by the ministerial exception. *See Patton v. Jones*, 212 S.W.3d 541, 547 (Tex. App.—Austin 2006, pet. denied).

are merely personal complaints regarding what Torralva viewed as defamatory comments by Church personnel. Accordingly, the *Sherbert* exception does not apply.

We conclude that the trial court did not err in determining that the ecclesiastical abstention doctrine and the ministerial exception applied to bar Torralva's claims. Its granting of appellees' plea to the jurisdiction was proper. Torralva's issues are overruled.[6]

### III. CONCLUSION

We affirm the judgment of the trial court.


DORI CONTRERAS GARZA,
Justice

Delivered and filed the
18th day of April, 2013.

---

[6] By his second issue, Torralva alleges that the trial court "refus[ed] [his] request to present sworn testimony" and "refused to allow any testimony or evidence [and] instead relied on the pleadings" of the parties. He does not support his argument with references to authority or to the record, nor does he explain what "testimony or evidence" he intended to put on that would have affected the outcome of the case. *See* TEX. R. APP. P. 38.1(i). In any event, we have reviewed the record and cannot locate any instance where the trial court "refused" any request to put on evidence. This issue has, therefore, not been preserved for review. *See* TEX. R. APP. P. 33.1(a).