

# NUMBER 13-19-00412-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

MSGR. MICHAEL HERAS,                                  **Appellant,**

v.

THE DIOCESE OF CORPUS CHRISTI
AND BISHOP WILLIAM MICHAEL MULVEY,          **Appellees.**

On appeal from the 319th District Court
of Nueces County, Texas.



# NUMBER 13-19-00413-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

FR. JOHN FEMINELLI,                                               Appellant,

v.

THE DIOCESE OF CORPUS CHRISTI
AND BISHOP WILLIAM MICHAEL MULVEY,                    Appellees.

## On appeal from the 319th District Court
## of Nueces County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Hinojosa**
**Memorandum Opinion by Justice Longoria**

Appellants Monsignor Michael Heras, in appellate cause number 13-19-00412-CV,

and Father John Feminelli, in appellate cause number 13-19-00413-CV, appeal the trial

court's order granting appellees Diocese of Corpus Christi (Diocese) and Bishop William Michael Mulvey's amended plea to the jurisdiction based upon the ecclesiastical abstention doctrine.[1] Appellants raise three issues, which we address as one, concerning whether: (1) the ecclesiastical abstention doctrine barred their defamation suits; (2) appellees met all three necessary requirements of *Patton v. Jones*, 212 S.W.3d 541, 545 (Tex. App.—Austin 2006, pet. denied), so as to have the ecclesiastical abstention doctrine apply; and (3) the alleged defamatory statements are actionable due to "pivotal nuances" as identified by *In re Diocese of Lubbock*, 592 S.W.3d 196 (Tex. App.—Amarillo 2019, orig. proceeding) (*In re Diocese of Lubbock I*), *mand. conditionally granted sub nom. In re Diocese of Lubbock*, 624 S.W.3d 506 (Tex. 2021) (orig. proceeding) (*In re Diocese of Lubbock II*), *cert. denied*, 142 S.Ct. 434 (2021). We affirm.

## I.     BACKGROUND & PROCEDURAL HISTORY[2]

In 2002, the United States Conference of Catholic Bishops (USCCB) authored the Charter for the Protection of Children and Young People (Charter). In June of 2018 it was revised to "re-affirm [the USCCB's] deep commitment to sustain and strengthen a safe environment within the Church for children and youth." The Charter consists of a "series of practical and pastoral steps" to make effective the USCCB's "[g]oals of a safe environment within the Church for children and young people and of preventing sexual abuse of minors by clergy in the future[.]"

---

[1] For purpose of briefing, we granted appellant Heras's motion to consolidate appellate cause number 13-19-00412-CV, with appellate cause number 13-19-00413-CV, on December 6, 2019. In the interest of judicial efficiency, we also resolve these appeals in one memorandum opinion.

[2] The background was derived from the evidence and pleadings in the record.

One step includes having a review board to advise the bishop of its assessment of allegations of sexual abuse of minors, and its determination of a cleric's suitability for ministry. Another step calls for openness and transparency in communicating with the public about sexual abuse of minors by clergy within the confines of respect for the privacy and reputation of those involved.[3] The Chancellor of the Diocese, Benedict T. Nguyen, averred that the Diocese is governed by the Charter, and pursuant to the Charter "the Diocese has been open and transparent in communicating with the public about sexual abuse of minors by clergy[.]" Chancellor Nguyen also explained that the Diocese has committed itself to taking steps and making decisions needed to fulfill the Charter.

In October of 2018, the Diocese's Bishop, Bishop Mulvey, informed his "Brother Priests" that to restore trust and for total transparency, he, in conjunction with his fellow bishops, had decided "to release the names of clergy who have been credibly accused of sexually abusing a minor since 1950" at the end of January 2019. Additionally, a press release was sent to the local media containing a statement from Bishop Mulvey, which stated:[4]

> To the people of God in the Diocese of Corpus Christi:
>
> I am joining with my brother bishops in Texas, in response to the division and suffering caused by abuse, in a mutual call to action. You will find in the attached announcement a decision by the bishops of Texas to release the names of clergy credibly accused of sexual abuse of minors. The list will be published in January 2019.

---

[3] The Texas Supreme Court has stated, in a case with similar facts and circumstances, that: "The Charter encourages more transparency within the Catholic Church around issues of sexual abuse and represents a shift in how sexual abuse within the Church is addressed." *In re Diocese of Lubbock*, 624 S.W.3d 506, 511 (Tex. 2021) (*In re Diocese of Lubbock II*).

[4] We note that the press release is not dated.

I remain committed to doing all in my power to protect our children. It is my fervent hope and prayer this will continue the process of healing and justice to those who have been affected by this evil.

Thank you for your commitment to our faith and the life of the Gospel.

Faithfully yours in Christ, I remain[.]

The press release also included two attachments. The first attachment was another release announcing the Texas Catholic dioceses' plan to release the names of "clergy credibly accused of sexual abuse of minors" and surrounding details. The second attachment was from the Texas Catholic Conference of Bishops (TCCB) which stated:

- Dioceses to Publish Local Lists. Texas dioceses are actively reviewing files of bishops, priests, and deacons. By January 31, 2019, each bishop will publish a list of clergy credibly accused of sexual abuse of a minor in his diocese dating back to at least 1950.[5]

Appellants' names were not included on the press release or its attachments.

Appellants, who deny ever sexually abusing a minor,[6] contend that they demanded through counsel that their names not be included on the list. On January 31, 2019, the

---

[5] "The Texas Conference of Catholic Bishops ("TCCB") is an unincorporated ecclesiastical association that furthers the religious ministry of the Roman Catholic Bishops and Archbishops in the State of Texas." *Whole Women's Health v. Smith*, 896 F.3d 362, 364 (5th Cir. 2018). "Catholic Bishops communicate through TCCB to determine how the Catholic Church should address various moral, theological, and social issues[.]" *Id.*

[6] Heras avers that:

With respect to any statement that there are "credible" accusations against me that I committed "sexual abuse of a minor" within the boundaries of the Diocese of Corpus Christi—that is, somewhere within the borders of the twelve counties of Aransas, Bee, Brooks, Duval, Jim Wells, Kenedy, Kleberg, Live Oak, Nueces, Refugio, San Patricio, and parts of McMullen—has to be false in that I have never engaged in any "sexual abuse of a minor," as that term is ordinarily understood—that is that there was some sort of physical sexual contact with a minor or any indirect sexual abuse with a minor such as exposing myself in a lewd or indecent manner in front of minors or showing pornography to minors below the age established by law. I have never engaged in any behavior with a minor that could be constituted as a sexual crime against a minor under any of the laws of the State of Texas. The assertion that there have been one or more "credible" accusations of "sexual abuse of a minor" is entirely false.

"names of the Roman Catholic clerics who have been credibly accused of sexually abusing a minor within the Diocese" were published on the Diocese's webpage along with an accompanying statement from Bishop Mulvey. The parties do not dispute that appellants' names were included on the list. Bishop Mulvey's accompanying statement generally explained the purpose behind the release and the review process that appellees relied upon to determine who to include on the list. It also invited others to report any sexual abuse by a cleric member. Additionally, contemporaneously with or soon after the release of the list, Bishop Mulvey addressed his "[B]rothers and Sisters in Christ" in a video on the Diocese's website where he apologized for the "horrible crime of sexual abuse that has plagued our Church" and called for prayer and healing for those that have been abused and their families. Appellants were not identified on the video.

On March 7, 2019, appellants filed separate defamation suits against appellees regarding the release of the list and surrounding statements. Specifically, among the allegations in their live pleadings, appellants assert that appellees defamed them by "[p]ublishing to the public at large a video and list and/or statement asserting as fact that [they] were credibly accused of a 'hideous crime' of sexual abuse of a minor" and that

---

Feminelli avers that:

> With respect to any statement that there are "credible" accusations against me that I committed "sexual abuse of a minor" within the boundaries of the Diocese of Corpus Christi—that is, somewhere within the borders of the twelve counties of Aransas, Bee, Brooks, Duval, Jim Wells, Kenedy, Kleberg, Live Oak, Nueces, Refugio, San Patricio, and parts of McMullen—has to be false in that I have never engaged in any "sexual abuse of a minor," as that term is ordinarily understood—that is some sort of physical sexual contact with a minor or any indirect sexual abuse such as a [sic] exposing myself in a lewd or indecent manner in front of minors or showing pornography to minors below the age established by law. I have never engaged in any behavior with a minor that could be constituted a sexual crime against a minor under any of the laws of the State of Texas. The assertion that there have been one or more "credible" accusations of "sexual abuse of a minor" is completely false.

6

"[appellees'] statement[s] w[ere] false because there was, and is, no evidence that [they] w[ere] credibly accused of the crime of sexual abuse of a minor." Appellants assert that "[t]he plain and ordinary meaning of 'sexual abuse of a minor' is that there was a credible accusation that [they w]ere credibly accused of sexual impropriety and credibly accused of a criminal offense under the laws of the State of Texas[.]"[7] In response, appellees filed pleas to the jurisdiction based upon the ecclesiastical abstention doctrine which they later amended. Appellants responded to appellees' amended pleas. A hearing over the course of two separate days, July 11, 2019 and July 23, 2019, was held on appellees' pleas. At the conclusion of the July 23 hearing, the trial court took the matter under advisement, and on April 5, 2019, the trial court granted appellees' pleas. This appeal ensued.

On appeal, after submission of the briefs and oral argument, we abated this case in the interest of judicial economy pending resolution of *In re Diocese of Lubbock I* before the Texas Supreme Court, which involved similar facts and circumstances.[8]. 592 S.W.3d at 196. After the Texas Supreme Court issued its opinion, *In re Diocese of Lubbock II*, appellees filed two letter briefs, and we have since reinstated this appeal. 624 S.W.3d at 506.

---

[7] Appellants also allege that Bishop Mulvey publicly exposed the list in interviews with local media. They averred in their affidavits that "[i]n an interview given to KZTV Action 10 News, Mulvey stated that the publication [of the list] was to 'the entire community,' including 'Corpus Christi,' and not only to members of the Diocese." The record shows that Bishop Mulvey participated in an interview with Joe Gazin, a local journalist, in which the importance of transparency was discussed. However, there is no evidence of any other interview in the record. Nonetheless, even if we took appellants' allegations as true, it would not alter our disposition. *See In re Diocese of Lubbock II*, 624 S.W.3d at 506.

[8] In addition to the parties' briefing, the TCCB favored this Court with briefing as amicus curiae in support of appellees and for affirmance. Appellants filed a response to the amicus curiae brief.

## II. ECCLESIASTICAL ABSTENTION DOCTRINE

By three issues which we address together, appellants assert that the ecclesiastical abstention doctrine does not apply and *In re Diocese of Lubbock I* and *Patton* are outcome determinative*. See In re Diocese of Lubbock I*, 592 S.W.3d at 196; *Patton*, 212 S.W.3d at 541. More specifically, appellants argue that under *Patton*, appellees are not entitled to ecclesiastical abstention doctrine protection because they failed to establish that "[(1)] such a claim flows entirely from an employment dispute between a church and its pastor so that consideration . . . in isolation from the church's decision as to the pastor is not practical, (2) the alleged 'publication' is confined within the church, and (3) there are no unusual or egregious circumstances." *See Patton*, 212 S.W.3d at 554.[9] Relying principally upon *In re Diocese of Lubbock I, a*ppellants also argue that there are six "pivotal nuances"[10] which make the ecclesiastical abstention doctrine inapplicable. 592 S.W.3d at 202, 204.

However, as discussed in detail below, the Texas Supreme Court has since conditionally granted the Diocese of Lubbock's petition for writ of mandamus previously denied by the Amarillo Court of Appeals, *see In re Diocese of Lubbock I*, 592 S.W.3d at 205, and vacated the trial court's judgment for want of jurisdiction based on the

---

[9] Appellants also argue, with citation to *Hayden v. Schulte*, 701 So.2d 1354, 1356 (La. Ct. App. 1997), that the issue of child molestation and accusing someone of such a heinous offense is not a matter of religious doctrine, theology, or internal church displine, but rather defamation *per se*. However, we are not bound to follow out-of-state authorities. *See Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex. 1993) (explaining that while other federal or state court opinions might be persuasive authority, Texas appellate courts are obligated "to follow only higher Texas courts and the United States Supreme Court").

[10] Appellants argue that the six "pivotal nuances" that result in the loss of ecclesiastical abstention protection are: (1) public exposure of the matter; (2) the decision to publish is different from decision to discipline; (3) concern with society at large; (4) publishing for public relations; (5) broader misconduct than mere "ecclesiastical delict,"; and (6) publicly not using words as ordinarily perceived by public.

8

ecclesiastical abstention doctrine. *See In re Diocese of Lubbock II*, 624 S.W.3d at 519; *see also Doe v. Roman Catholic Diocese of Dall.*, No. 05-19-00997-CV, 2021 WL 3556830, at *10 (Tex. App.—Dallas Aug. 11, 2021, pet. filed) (mem. op.) (explaining that the Texas Supreme Court rejected and overruled *In re Diocese of Lubbock I*). Additionally, as addressed below, while the Texas Supreme Court references *Patton*, it does not do so in the manner advanced by appellants. *See In re Diocese of Lubbock II,* 624 S.W.3d at 514, 518.

Being instructive, the Texas Supreme Court's opinion in *In re Diocese of Lubbock II*, is discussed in some detail below. *See* 624 S.W.3d at 506; *see also Jordan & Assocs. v. Wells*, No. 01-14-00992-CV, 2015 WL 4591786, at *4 (Tex. App.—Houston [1st Dist.] July 30, 2015, no pet.) (mem. op.) ("[A]s an intermediate appellate court, we are constrained to apply the holdings of our superior courts, when applicable.").

## A.      Standard of Review

"Lack of jurisdiction may be raised by a plea to the jurisdiction when religious-liberty grounds form the basis for the jurisdictional challenge." *In re Diocese of Lubbock II*, 624 S.W.3d at 512 (quoting *Westbrook v. Penley*, 231 S.W.3d 389, 394 (Tex. 2007)). A plea to the jurisdiction is a dilatory plea, the purpose of which is to defeat an action without regard to whether the claims asserted have merit. *See Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000); *see also Doe*, 2021 WL 3556830, at *4. We review a trial court's ruling on a plea to the jurisdiction de novo. *In re Diocese of Lubbock II*, 624 S.W.3d at 512; *see Torralva v. Peloquin*, 399 S.W.3d 690, 695 (Tex. App.—Corpus Christi–Edinburg 2013, pet. denied); *see also Ceglar v. Christ's Harbor Church*, No. 13-

9

19-00034-CV, 2020 WL 948380 at *2 (Tex. App.—Corpus Christi–Edinburg Feb. 27, 2020, pet. denied) (mem. op.).

We focus on the plaintiff's petition first to determine whether the facts pled affirmatively demonstrate that subject matter jurisdiction exists. *Westbrook,* 231 S.W.3d at 394–95; *Torralva*, 399 S.W.3d at 695. When "[t]he pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause[,]" a court should deny a plea to the jurisdiction. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 378 (Tex. 2009). If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and a plaintiff should be afforded an opportunity to amend. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226–27 (Tex. 2004). If the pleadings affirmatively negate the existence of jurisdiction, then a plea may be granted without allowing a plaintiff an opportunity to amend. *Id.* at 227. "We construe the pleadings liberally in favor of the plaintiff." *Peloquin*, 399 S.W.3d at 695. If a plea challenges the existence of jurisdictional facts, the trial court may consider evidence beyond the pleadings and must do so when necessary to resolve the jurisdictional issues raised. *See Miranda*, 133 S.W.3d at 227; *see also Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 550 (Tex. 2019); *Doe*, 2021 WL 3556830, at *4. "[W]hen a plea to the jurisdiction challenges the existence of jurisdictional facts with supporting evidence, the standard of review mirrors that of a traditional summary judgment: all the evidence is reviewed in the light most favorable to the plaintiff to determine whether a genuine issue of material fact exists." *Swanson*, 590 S.W.3d at 550.

**B.      Applicable Law**

The First Amendment to the United States Constitution prohibits Congress from making any "law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. amend I; *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S.Ct. 2049, 2060 (2020); *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 181 (2012). The Fourteenth Amendment imposes this restriction on the states. *See* U.S. CONST. amends. I, XIV; *see also Iglesia Pentecostal Filadelfia, Inc. v. Rodriguez*, No. 13-20-00012-CV, 2021 WL 6129316, at *4 (Tex. App.—Corpus Christi–Edinburg Dec. 29, 2021, no pet. h.) (mem. op.). Grounded in the First Amendment is the ecclesiastical abstention doctrine, *see In re Diocese of Lubbock II*, 624 S.W.3d at 509, which forbids civil courts from delving into matters of "[t]heological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them . . . ." *Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 714 (1976); *see Peloquin*, 399 S.W.3d at 695. A core tenet of First Amendment jurisprudence is that, in resolving civil claims, courts must be careful not to intrude upon internal affairs of church governance. *See Westbrook*, 231 S.W.3d at 397 (citation omitted); *see also In re Thomas*, No. 06-21-00106-CV, 2022 WL 126708, at *5 (Tex. App.—Texarkana Jan. 14, 2022, no pet. h.) (mem. op.).

The Texas Supreme Court recently addressed the ecclesiastical abstention doctrine in a case involving a deacon whose suit for defamation and intentional infliction of emotional distress arose out of an internal investigation by the diocese into its own clergy, the inclusion of the deacon's name on a list of its clergy "credibly accused" of sexual abuse of a minor, and public statements by the diocese regarding the list. *In re*

11

*Diocese of Lubbock II*, 624 S.W.3d at 509–19. The deacon maintained that he never sexually abused a child and was defamed by the diocese by publicly implying that those on the list were guilty of such abuse. *Id.* at 509. The Texas Supreme Court dismissed the deacon's suit for want of jurisdiction based on the ecclesiastical abstention doctrine, concluding "[t]hat the substance and nature of the deacon's claims against his church w[ould] necessarily require the trial court to evaluate whether the Diocese [of Lubbock] properly applied Canon Law and [were] inextricably intertwined with the Diocese [of Lubbock's] internal directive to investigate its clergy." *Id.* at 509. In reaching its conclusion, the court explained in pertinent part that:

> In determining whether ecclesiastical abstention applies, courts will analyze whether a particular dispute is ecclesiastical or merely a civil-law controversary in which the church happens to be involved. In making this determination, we look to the substance and nature of the plaintiff's claims. Because courts are prohibited from risking judicial entanglement with ecclesiastical matters, if the substance and nature of the plaintiff's claims are inextricably intertwined with matters of doctrine or church governance, then the case must be dismissed.

*Id*. at 514 (internal citations omitted).

The First Amendment, however, does not bar all claims against religious bodies. *See Tilton v. Marshall*, 925 S.W.2d 672, 677 (Tex. 1996); *see also In re Thomas*, 2022 WL 126708, at *5. A court may exercise jurisdiction over a controversy if it can apply neutral principles of law that will not require inquiry into matters such as religious doctrine. *See Westbrook*, 231 S.W.3d at 398–400; *Shannon v. Mem'l Drive Presbyterian Church U.S.*, 476 S.W.3d 612, 622–25 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (concluding that the ecclesiastical abstention doctrine did not apply to bar employee's claims which arose out of the church's purported disparagement of such employee in violation of a settlement agreement); *see also Dean v. Alford*, 994 S.W.2d 392, 395 (Tex.

12

App.—Fort Worth 1999, no pet.). "Under the neutral principles methodology, courts decide non-ecclesiastical issues such as property ownership based on the same neutral principles of law applicable to other entities, . . . while deferring to religious entities' decisions on ecclesiastical and church polity questions." *Masterson v. Diocese of Nw. Tex.*, 422 S.W.3d 594, 596 (Tex. 2013) (internal citation omitted). Nevertheless, "[a]ny exception to ecclesiastical abstention by application of neutral principles must be narrowly drawn to avoid inhibiting the free exercise of religion or imposing secular interests on religious controversies." *In re Diocese of Lubbock II*, 624 S.W.3d at 513.

## C.      Analysis

Following *In re Diocese of Lubbock II*, we hold appellants' defamation suits are barred by the ecclesiastical abstention doctrine because the substance and nature of the appellants' claims against appellees are inextricably intertwined with appellees' internal directive for openness and transparency. *See id.* at 509. More specifically, appellants' claims are inextricably intertwined with appellees' decision to release the list in compliance with an internal church directive—namely, the Charter and decision by the TCCB—to be open and transparent in communicating with the public about sexual abuse of minors by clergy. *Id.* at 518 ("Even to the extent . . . [the deacon's] suit challenges the publication of the list, . . . the Diocese only published the results of its . . . investigation. That is, [his] claims are inextricably intertwined with the Diocese's decision to include his name on the list . . . at the culmination of its investigation into its clergy.").

Here, appellants impermissibly seek to impose liability on appellees for compliance with an internal church instruction of openness and transparency. *See id.* at 517 (ultimately barring deacon's claims after reasoning in part that "[his] suit seeks to impose

13

liability on the Diocese for complying with its directive to investigate allegations of sexual abuse of its clergy"); *see also Westbrook*, 231 S.W.3d at 392, 400, 405 (barring plaintiff's professional negligence claim where it would impose liability on a pastor for complying with a disciplinary procedure outlined in the church's constitution). Also, we conclude that appellants' claims are barred to the extent they call into question appellees' review process, or said differently, its investigation and conclusions, that led to the creation of the list. *See In re Diocese of Lubbock II*, 624 S.W.3d at 515 (explaining that "[t]o the extent [the deacon's] claims directly call into question the Diocese's investigation and conclusions that led to the creation of the list, they necessarily reach behind the ecclesiastical curtain").

Moreover, appellants' pleadings show that the substance and nature of their claims ultimately challenge the result of appellees' internal investigation into the Diocese's clerics, an inherently ecclesiastical matter, as they allege that "[appellees'] statement[s] w[ere] false because there was, and is, no evidence that [they] w[ere] credibly accused of the crime of sexual abuse of a minor."[11] *In re Diocese of Lubbock II*, 624 S.W.3d at 518

---

[11] While appellants in their second issue argue that there are "pivotal nuances" as discussed in *In re Diocese of Lubbock I*, the Texas Supreme Court has since re-focused the lens through which we are to determine the ecclesiastical abstention doctrine's applicability, and which we applied herein. *See In re Diocese of Lubbock II*, 624 S.W.3d at 516. Specifically, the court stated:

> [T]he court of appeals [in *In re Diocese of Lubbock I*] concluded that a "pivotal nuance" in this case is that the Diocese's communication went beyond church walls. It reasoned that a key fact in determining whether ecclesiastical abstention applies is to whom the church communicated. The court observed that a church publicizing "matters historically deemed ecclesiastical" undermines a church's ability to argue that the "dispute remains an internal ecclesiastical or church polity issue." That is, the court of appeals focused primarily on the *publication* of the list without regard to the Diocese's *reason* for including [the deacon] on the list.

> Whether a party's claims against a church are barred by ecclesiastical abstention, though, is based not on whether a publication goes beyond church walls but rather whether the substance and nature of the plaintiff's claims implicate ecclesiastical matters, including a

(barring deacon's suit after reasoning in part that "[h]is own pleadings and concessions cut against [his neutral principles] argument because his suit ultimately challenges the result of a church's internal investigation into its own clergy, which is inherently ecclesiastical"); *see also Doe*, 2021 WL 3556830, at *8 ("[C]ourts are prohibited from investigating and resolving application of religious doctrine and practice.").

Said another way, appellants' suit is ultimately a challenge to the appellees' investigative results. *See In re Diocese of Lubbock II*, 624 S.W.3d at 517 ("It is the fruit of this investigation about which [the deacon] complains, and the publications he contests merely reflect the investigative result."). But the results and related statements at issue merely reflect appellees' application of an internal directive of transparency. *Id.* ("A civil court, though, is prohibited from determining whether a church properly applied its own principles and policies, and from interfering with internal management decisions that are central to its mission, such as investigating the conduct and character of its clergy.") (internal citations omitted).

Lastly, while the *In re Diocese of Lubbock II* court cites *Patton*, it does not do so in the manner advanced by appellants.[12] *See id.* at 514, 518. The court implicitly denied that

---

church's internal affairs, governance, or administration. The court of appeals' focus on the publication ignores the real critical nuance in this case, that [the deacon's] suit is "inextricably intertwined" with the Diocese's decision to investigate its own clergy, judicial review of which would impermissibly interfere with a church's ability to regulate the character and conduct of its leaders.

*Id.* (internal citations omitted).

[12] We observe that the Austin Court of Appeals in *Patton* stated that: "The 'ecclesiastical abstention doctrine' provides a broader analysis that encompasses the 'ministerial exception.'" *Patton v. Jones*, 212 S.W.3d 541, 548 (Tex. App.—Austin 2006, pet. denied) ("The ecclesiastical abstention doctrine prevents secular courts from reviewing many types of disputes that would require an analysis of 'theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them."). The court observed one type of circumstance in which the ecclesiastical abstention doctrine generally applies. *See id.*

the three-prong test articulated in *Patton* must be established in every instance for the ecclesiastical abstention doctrine to apply. *Id.* Instead, the Texas Supreme Court cited *Patton* for support that public statements *do not* necessarily foreclose ecclesiastical protection.[13] *Id.* at 518–19 (emphasis added). As such, to the extent appellees' statements at issue were made to the public, the doctrine nonetheless applies under these facts as they reflect change in furtherance of the Charter. *See id.* at 519. ("The Diocese . . . disclosed to the public its reforms to handling sexual-abuse allegations within the church. Such discussion of changes in church policy, which the Diocese explains were rooted in broader church governance decisions, do not revoke ecclesiastical protection.").

Thus, the trial court was without subject matter jurisdiction based upon the ecclesiastical abstention doctrine. *See id.* at 509, 514–19. Accordingly, we overrule appellants' three issues.

### III.    CONCLUSION

We affirm the trial court's judgments.

NORA L. LONGORIA
Justice

Delivered and filed on the
10th day of March, 2022.

---

[13] In *In re Diocese of Lubbock II*, the Texas Supreme Court also cited to *Patton* for the rule that we are to look to the substance and nature of the plaintiff's pleading in determining whether the ecclesiastical abstention doctrine applies. *See In re Diocese of Lubbock II*, 624 S.W.3d at 514.